WILL BLACKWELL AND ROBERT BLACKWELL, *Plaintiffs in Error, v.* THE STATE OF FLORIDA, *Defendant in Error.*

Opinion filed July 27, 1918.

1. Where it is alleged in an affidavit of the defendant in a criminal case in suport of a motion for a change of venue that the defendant is odious to the people of the County, that the prejudice against him is very great, and that a fund had been subscribed to by the citizens of the County and collected by a Deputy Sheriff to employ additional counsel to assist in the prosecution of the defendant, and

where two of the attorneys for the defence swear that on account of the vast and powerful influence of the sheriff that the people of the County were greatly prejudiced against the defendants, and that the Sheriff had proclaimed his belief in the guilt of the prisoners and thereby caused the people generally to hate and despise the defendants and believe them guilty, and these allegations are not traversed by the State, it was reversible error to refuse to grant a change of venue.

2. Where an application for a change of venue is based on the prejudice of the Judge against the defendants, no discretion is vested in the Judge to hear and determine the question of whether or not he is prejudiced.

3. Where it is alleged in an affidavit in support of a motion for change of venue on the grounds of the prejudice of the Judge against the defendant, that the Judge "yielded to public clamor," and called a special term of the Court a short time before the regular term of the Court would convene, and that in doing this he acted "solely at the behest of public sentiment," and that he did this without any other and further reason than that the "people of the County demanded speedy justice," it was reversible error to refuse the motion.

4. Remarks made by counsel in the presence of the Jury which would naturally tend to influence their minds to the prejudice of the defendants, when called to the attention of the Court, should be stricken from the record, and the jury admonished that they should give no consideration to such remarks, and the refusal of the Court to do so is reversible error.

5. It is improper for counsel in his argument to the Jury to say "if there is any error committed in this case the Supreme Court over in the capital of our State is there to correct it, if any error should be done," as the effect of this would be to cause the jury to lessen their estimate of the weight of their responsibility, and the refusal of the

Court to strike the same from the consideration of the jury is reversible error.

6.  Language used by counsel in his argument to the Jury tending to influence them to shift the burden of their responsibility from themselves to the Supreme Court, is improper, and when called to the attention of the Trial Judge should be stricken from the consideration of the Jury, the refusal to do so is reversible error.

7.  Remarks made by counsel in his argument before the Jury prejudicial to the defendants and concerning matters which are not proper for the Jury to consider when they retire to deliberate upon their verdict, should be stricken by the Trial Judge, and the refusal to do when brought to his attention, is reversible error.

8   One who contributes to a fund to empoly an attorney to assist in the prosecution of a person charged with an offense, is disqualified to sit as a juror on his trial for such offense.

Writ of Error to Circuit Court for Okaloosa County, A. G. Campbell, Judge.

Judgment reversed.

*H. S. Laird, L. W. Nelson, W. W. Clark* and *W. J. Rice,* for Plaintiffs in Error;

*Van C. Swearingen,* Attorney General, and *C. O. Andrews,* Assistant, for the State.

BROWNE, C. J.—Will Blackwell and Robert Blackwell, brothers, were jointly indicted in Okaloosa County in two separate indictments for the murder of M. M. Davis and his wife, Nancy Davis, and on May 7th, 1917, were

put upon trial under the indictment charging them with the murder of Nancy Davis. During the course of the trial the defendant, Will Blackwell, escaped from custody, thereby necessitating an order of mistrial. After a lapse of about three weeks he was recaptured, and on July 2, 1917, the defendants were placed on trial for the murder of M. M. Davis, were convicted of murder in the first degree, and sentenced to death. The case comes here for review on writ of error.

There are twenty-three assignments of error, some of which have been abandoned and others it will not be necessary for us to consider. The second assignment is that the Court erred in denying defendants' motion for a change of venue. The grounds of the motion for a change of venue are as follows: "1. That they fear that they will not receive a fair trial in the Circuit Court of the First Judicial Circuit of Florida in and for the County of Okaloosa, or in any other county within said Circuit, on account of the prejudice of the Judge of said Court against them, the said Will Blackwell and Robert Blackwell.

"2. On account of the adverse party, to-wit, the State of Florida, by and through its officers, namely, the Sheriff and his deputies, having an undue influence over the minds of the inhabitants of Okaloosa County, Florida.

"3. Because the applicants, the said Will Blackwell and Robert Blackwell are so odious in the minds of the people of Okaloosa County, Florida, and the adjoining counties to Okaloosa County, Florida, in the First Judicial Circuit of Florida, on account of the rumors and reports of their guilt of the crime with which they are charged, that it will be impossible for them or either of them, or that they fear it will be impossible for them or

either of them to obtain a fair and impartial trial in said Court."

Both the defendants made affidavits in support of the motion, and Mr. Laird and Mr. Rice, Attorneys for the defendants, swore that the crime charged, the unprovoked and deliberate murder of a very old man and his aged wife, was of such heinous nature that the citizenship of the county must necessarily be wrought up to a frenzy and great anger towards anyone so unfortunate as to be charged with it; that the defendants were confined in jail in Pensacola and were not brought into the county in which they were to be tried until nine o'clock in the morning of the day when the motion was made; that after the prisoners were brought into court and arraigned, the attorneys for the defence were given fifteen minutes to inspect the indictment and confer about the case; that after the presentation of their motion for a change of venue they were given until 2 P. M. of the same day in which to prepare affidavits in support of their motion; that the defendants during that time were handcuffed together and closely guarded, so that they nor either of them could talk with anyone about the case; that they had no kinsfolk or friends to go out and see anyone and get affidavits for them. These attorneys, officers of the court, also swore that to their certain knowledge the Sheriff of the county was a very popular man, of vast and wonderful influence, who had publicly proclaimed on many different occasions that the defendants were guilty, and in this way he had exercised a wonderful and undue influence over the minds of the mass of the citizens of the county, and had aided in causing the people generally in the county to hate and despise the defendants and believe them guilty; they also swore that they believed that if they were given a reasonable time to

go out and see the people and talk with them that they could secure a very large percentage of reputable citizens of the county to make affidavits to the same effect as their affidavits. Against these specific allegations of fact the State produced an affidavit by the Clerk of the Circuit Court who stated that he had talked with the people residing in almost every section of Okaloosa County, and that in his opinion the defendants could receive a fair and impartial trial in that county; Mr. J. H. Richburg and Mr. Sutton, the Sheriff, in their affidavits stated that in their opinions the defendants could get a fair and impartial trial in the county. Mr. Sutton did not deny the allegations in the affidavits of Mr. Laird and Mr. Rice as to his great influence in the community, or that he had proclaimed in all parts of the county his belief in the guilt of the prisoners, and that his attitude towards them had aided in causing the people generally in the county to hate and despise the defendants and believe them guilty.

The allegations in the affidavit of the defendants that they were odious to the people of Okaloosa County, that the prejudice against them was very great, that a fund had been subscribed to by the citizens of the county and collected by one Moore, a deputy sheriff, to employ additional counsel to assist the State Attorney to prosecute the defendants, and the allegations in the affidavits of Mr. Laird and Mr. Rice that on account of the vast and wonderful influence of the Sheriff that the people of the county were greatly prejudiced against the defendants, and that the Sheriff by proclaiming his belief in the guilt of the prisoners had caused the people generally to hate and despise the defendants and believe them guilty, were not traversed by the State, and the only thing before the Court against these very strong and positive declarations

showing such prejudice as would preclude their obtaining a fair and impartial trial in the county were the statements of three persons that, in their opinion, the prisoners could get a fair and impartial trial in the county.

The affidavits of the defendants, and Mr. Laird and Mr. Rice contain allegations of fact upon which they base their opinions that a fair and impartial trial could not be had, and against these were placed the mere opinions of three persons that the prisoners could get a fair and impartial trial. Not one denies the allegations of fact in the affidavits produced by the prisoners. If as stated in these affidavits the Sheriff was "a popular man in the county," and "of vast and wonderful influence," and had "talked and publicly said on many different occasions that the defendants were guilty," and that "he had thereby caused the people of the county to hate and despise the defendant and believe them to be guilty," and a fund had been "solicited from the people of the county by a deputy of the Sheriff for the purpose of employing counsel to assist in the prosecution" of the defendants, which, as the record shows, was subscribed to by a number of persons, that three of those on the special venire were subscribers to the fund, can it be said that the defendants could obtain a fair and impartial trial in the face of such conditions? As the court below decided that question in the affirmative and as a jury was obtained, each member of which swore that he was unprejudiced, and as the case will have to be reversed on other grounds, we are not inclined to disturb the Court's conclusion upon that point.

The application for a change of venue contained the further ground of the prejudice of the judge. This is a very serious charge and one not apt to be lightly made. The records of this Court do not show that this provision of the law has ever before been invoked by a defendant

in a criminal proceeding. The statute seems to contemplate that all that it is necessary for a defendant in a criminal case to do is to make affidavit that the judge is prejudiced against him, and it then becomes the duty of the judge to transfer the cause to the next nearest circuit.

The sections of the law governing changes of venue are as follows:

"Judges of all courts in this State shall have power and it shall be their duty to grant changes of venue of all cases pending before them, civil or criminal, under the circumstances and in the manner hereinafter provided by this article." Section 1469, General Statutes, 1906.

"Such change shall be granted if either party in any civil case, or the defendant in any criminal case, shall make application therefor on oath stating that he fears that he will not receive a fair trial in the court where the suit is pending, on account of the prejudice of the judge of the said court against the applicant or in favor of the adverse party, or on account of the adverse party having an undue influence over the minds of the inhabitants of the county or justice's district in which the case is pending, or on account of applicant being so odious; such application shall fully and distinctly set forth the facts upon which the same is founded." Section 1471, General Statutes, 1906.

"In all applications for change of venue, except when made upon the grounds of prejudice of the pending judge, the adverse party shall have the right to traverse the allegations of the application, and the Court shall hear the evidence produced by either party and shall decide the matter accordingly." Section 1474, General Statutes, 1906.

"Whenever it shall be made to appear to the satisfac-

tion of the presiding judge of any of the circuit courts of this State that the venue of any cause, then pending in such court, should be changed either because a fair and impartial trial cannot be had in the county where the crime was committed, or because it is impracticable to get a qualified jury to try the case in the county where the crime was committed, or where it appears from the examination of the books of registration of the county, that there are not a sufficient number of registered voters to form a grand and petit jury, it shall be in the power and discretion of such judge to change the venue of such case, from the circuit court of the county where such cause is at the time pending to the circuit court of any other county within the same circuit." Section 3997, General Statutes, 1906.

Section 1471 contains three separate grounds for a change of venue; the prejudice of the judge against the applicant or in favor of the adverse party; the undue influence over the minds of the inhabitants of the county, by the adverse party, and the odiousness of the applicant. After enumerating these grounds, the statute provides that the applicant "shall fully and distinctly set forth the facts upon which the same is founded." It seems quite clear that it is the intention of the law that no discretion be left with the judge when the application is based upon his prejudice.

In the case of State v. Grinstead, 10 Kan. App. 78, 61 Pac. Rep. 976, the Court in discussing the mental attitude of a trial judge whom the defendant in a criminal action charged with prejudice said: "He may have believed that he could act without bias or prejudice in the trial, but it would be an experiment dangerous to the rights of the defendant to permit him to make the effort." That was a case where the defendant was on trial for criminal

libel. In the instant case the Court was experimenting with the lives of two men, which were forfeited by the jury.

In Indiana the prejudice of the judge is made a ground for a change of venue, and in a long line of decisions it is held that when an affidavit is made charging the trial judge with prejudice, it is imperative for him to grant the change. Witter v. Taylor, 7 Ind. 110; Shaw v. Hamilton, 10 Ind. 182; Shattuck v. Myers, 13 Ind. 46; Goldsby v. State, 18 Ind. 147; Mershon v. State, 44 Ind. 598; Manly v. State, 52 Ind. 215.

But in the instant case the defendants went further than was apparently necessary and stated "that the Judge of the said County, without other or further reason than that the people of the County of Okaloosa demanded speedy justice and no delays of the law, acting at the behest of public sentiment, has called this special term of Court to try the said defendants, when acording to the Statutes of the State of Florida, the regular fall term of said Court would commence on the last Monday of August, of this year." This is a charge that the Judge in calling the special term, acted at the behest of public sentiment and without any other or further reason than that the people of the County demanded "speedy justice." It is clear that what was meant by this statement is that the people demanded the conviction of the defendants and the Court yielded to that demand. We cannot divest ourselves of the knowledge which we possess, that people do not demand a speedy trial of persons for the purpose of acquitting them, nor does the demand for speedy trials exist in communities where there is no strong feeling against men charged with crime, and, however just the public sentiment may be which demands the speedy trial and conviction of persons be-

lieved to be guilty of the commission of heinous offenses, the Courts must be free from the influence of hostile public sentiment.

This Court has recognized that the commission of a heinous offense, is likely to arouse ecitement, indignation and prejudice against a person accused of the crime, and that a jury may be affected thereby if the trial takes place within a short time thereafter.

The judgment in the case of Rice v. State, 35 Fla. 236, 17 South. Rep. 286, was reversed on the evidence which the Court said was contradictory and inconsistent, and also said: "This view is also influenced to a consider able extent by the fact that the trial was had within four days of the alleged perpetration of the offense charged, which is likely to arouse excitement, indignation and prejudice against the acucsed."

The crime for which the Blackwell brothers were tried was a most revolting one. An old man of about ninety years of age and wife over seventy had been brutally murdered, for no apparent reason, although an effort was made on the trial to prove that they were murdered for their money, which it was claimed one of the defendant knew was carried in a belt around the waist of one of the murdered couple. About $400.00 was found on their persons after their death and no satisfactory reason appears in the testimony why the murderers, if robbery was the motive, did not accomplish their purpose.

The defendants were indicted on the 30th of April, 1917, arraigned on May 1st, and the cause set down for trial six days thereafter. On this day the defendant, Will Blackwell, escaped. He testified on the trial that being acquainted with the strong public sentiment in the County against him, and having failed to obtain a change of venue or continuance until public feeling might

subside, he knew it would be impossible for him to get a fair trial, and that he bribed the detective and Deputy Sheriff to permit him to escape. He swore that he unlocked the handcuffs with keys furnished him by the detective. This is denied by the officers who say that he slipped his hands out of them. Will Blackwell on the trial, challenged this statement and asked that the handcuffs be produced before the Jury to show that it would be impossible for him to slip his hands thruogh them. This was not done.

He was recaptured in the latter part of May, and a special term of Court was called for the second of July, to try the cause.

The revolting crime; the escape of one of the prisoners; the efforts made to recapture him by the use of dogs obtained from various persons in the county, all tended to give great publicity to the offense and to cause public sentiment to run high against the persons charged with the crime. In this state of public mind—of which it is charged the Circuit Judge had knowledge—he called a special term of Court to try the prisoners, although time for convening the regular term of Court for Okaloosa County was only a short time off.

It is apparent and quite natural that a strong public sentiment, hostile to the defendants, existed in Okaloosa County, and that their speedy trial was demanded by the people in order that they might be punished for the crime they were charged with having committed, and the defendants and their attorneys alleged in their affidavits that the Circuit Judge without other or further reasons yielded to public clamor and called the special term to try the prisoners.

As was said in the case of State v. Grinstead, *supra*, the Circuit Judge may have "believed that he could act

without bias or prejudice on the trial," but the defendants did not believe that he could, and they gave what seems to us to be sufficient reasons for their belief; and the Court erred in refusing the motion for change of venue.

The sixth and seventh Assignments of Error relate to the rulings of the Court below in excusing certain jurors upon the challenge of the State for cause.

It may be that these veniremen were qualified and should not have been excused, but as the Trial Court has a large discretion in the matter of excusing jurors, and as it does not appear that because this was done, the defendants were finally forced to accept objectionable jurors, we find that these assignments are not sustained.

The eighth assignment is predicated on a remark of the Assistant State Attorney in the examination of a Juror on his *voir dire*, who was being interrogated about his mental attitude on the question of finding a verdict of guilty where the penalty is hanging, when the following occurred: "Q. I mean have you any prejudice against bringing in a verdict of guilty where the penalty is hanging ? A. There is nothing to prevent it if they are guilty as far as that is concerned. Q. If they are guilty you would have nothing to do with the penalty. That is up to the judge? A. Yes, that is up to the judge. Q. And the pardoning board? Mr. Laird: We object to the remark of the counsel that it is up to the pardoning board. Court: I think he has a right to ask the question. Mr. Laird: We object to the statement here at this time that it will be up to the pardoning board. Court: The objection is overruled. Mr. Laird: The defendants except."

The Assistant State Attorney must have deemed it in the interest of the prosecution for him to state in the presence of the veniremen, from whom the Jury to try

the prisoners was to be chosen, that the future action of the Board of Pardons was entitled to consideration by them, else the question would not have been asked, and the Court would not have refused to strike it from the record on motion of defendants' counsel. If it had been a mere irrelevenat remark, not introduced to have any effect on the minds of the Jury the Lower Court would have striken it from the record. It must therefore be accepted that the Assistant State Attorney had a reason for putting the probable action of the Board of Pardons before the Jury, and the Judge considered the reason a good one, and by his ruling gave it the force and weight of his approval.

It is argued by the defendants that the purpose of the statement by the State Attorney was to bring to the attention of the Jurors the fact that the Board of Pardons had recenly commuted to life imprisonment the sentence of two prisoners who had been sentenced to death for a murder committed near the scene of the Davis murder. If so it was an improper remark, and should have met with the condemnation of the Judge.

If, however, it was the Assistant State Attorney's purpose to fix in the minds of the Jurors the thought that if they erred in finding a verdict of guilty the Board of Pardons might or would correct it, it was even more objectionable. That that thought was probably in the mind of the Assistant State Attorney seems probable from the error complained of in the 22nd assignment, which like that in the eighth is predicated upon the re-fusal of the Trial Judge to strike from the record an objectionable remark by the Assistant State Attorney, by which he called to the attention of the Jury that if they made a mistake in the verdict, some other tribunal could correct it.

In the Bill of Exceptions the following facts appear: The Assistant State Attorney in the course of his argument to the Jury said: "If there is any error committed in this case, the Supreme Court over in the capital of our State is there to correct it if any error should be done." "Mr. Laird: If the Court please, we object." "Mr. Stokes: He brought it out." "Mr. Laird: I said he always did make that argument, and I didn't think the Court would permit him—it is an unfair argument to the Jury." "The Court: I think it is legitimate argument after what has been said by counsel on the other side." "Mr. Laird: Note an exception."

The purpose and effect of this remark was to suggest to the Jury that they need not be too greatly concerned about the result of their deliberations, because if they committed an error in forfeiting the lives of the prisoners, the Supreme Court could correct it. To this remark the Court not only gave its approval by overruling the objection of the defendants, but he gave it his sanction by the statement "I think it is legitimate argument after what has been said by counsel on the other side."

In the case of Newton v. State, 21 Fla. 53, this Court said: "If the remarks so made by counsel were pertinent in argument they are proper for the consideration of the Jury when they have retired to deliberate upon their verdict." The Court in that case also said: "It has been said with truth that the comments and arguments of counsel in the progress of a trial before a Jury are controlable in the discretion of the Judge which presides; it is, however, a judicial discretion and if used to the injury of either, and it so appears properly in the record, an Appellate Court may and should revise and control it."

The Court in refusing to strike the remark of the As-

sistant State Attorney as to the existence of a Supreme Court to correct any error that might be made in the trial of the cause, in effect, told the Jury that it was proper matter for them to consider when they retired to make up their verdict. Calling this vividly to the attention of the Jury tended to lessen their estimate of the weight of their responsibility, and cause them to shift it from their consciences to the Supreme Court. This Court will not shirk that responsibility, but will condemn such a proceeding and declare that the remark of the Assistant State Attorney was improper and the refusal of the Trial Judge to strike it from the consideration of the Jury, prejudicial error.

The eighteenth and nineteenth Assignments of Error are predicated upon the admissibility of evidence.

John Helvenston, a witness for the State, testified that about two years before the Davis murder, a man by the name of Saunders sold three steers to a Mr. Adams; that Saunders kept a dog, and Will Blackwell asked him to kill it, so he could go to Saunders' place. Witness stated that he told Will Blackwell that he had killed several dogs and that he did not much mind killing a no-account dog. This testimony was clearly irrelevant, but was not objected to by counsel for the defendants when offered. We make no criticism of counsel for his failure to object to this testimony as irrelevant. The record shows that a mass of irrelevant testimony was admitted, to which in the earlier part of the trial, the defense interposed about fifty objections, and with the exception of one or two, they were overruled by the Court. Such testimony in nowise bore upon the issue being tried and served only to incumber the record and the attorneys for the defense may have deemed an effort to exclude it unnecessary.

The witness was then asked this question "Did he send you anything?" to which he replied: "Well, he sent me a bottle of poison; I say poison, he sent it, I couldn't say what it was."

He further testified that Mr. Robert Blackwell gave him what he called "the poison," and that he kept the package and when called on by the State he produced it, and was told to show it to the jury. It was then offered in evidence by the Assistant State Attorney, and Mr. Laird the counsel for the defendants objected to its introduction and moved to strike the testimony of the witness in relation to this transaction as irrelevant and immaterial, and because it was not shown "to have any connection with the Davis murder, or this case." The Court denied the motion to strike and overruled the objection to the introduction of the bottle in evidence, and permitted it to be introduced and shown to the Jury. It developed on further examination of this witness that a young woman lived in the house with the old man Saunders and his wife, and it appeared that Will Blackwell desired to visit her.

The entire testimony of this witness was improper and irrelevant, and as its purpose and effect was to prejudice the Jury against the prisoners about transactions that occurred about two years before the Davis murder, and had no connection with the case, the Court erred in refusing to strike the testimony and permitting the bottle alleged to contain poison to be introduced in evidence.

The twenty-third Assignment of Error is predicated upon the Court's refusal to grant a new trial, the fifth ground of which was the denial of the motion for a change of venue.

We have discussed the showing made by the defendants in their application for the change of venue, but

if the Court in the exercise of its discretion was not convinced from the affidavits offered at the time the motion was made, that the motion should be granted, there developed in the course of the trial strong circumstances in support of the defendants' motion, which the Court should have taken into consideration in determining this ground of the motion for a new trial.

In the examination of the Jurors it developed that a fund had been subscribed by a number of citizens in the County to employ an attorney to prosecute the case against these defendants, and that the Assistant State Attorney who conducted the case for the State was the person so employed.

While this point was not saved by the Plaintiffs in Error, we think the question involved should be decided by this Court as it may arise in another trial of these defendants.

There is some conflict of authorities on whether or not a contributor to a fund to apprehend and prosecute a certain class of violators of law, is disqualified to sit as a Juror on the trial of a person for an offense of the class, to the fund for the prosecution of which he was a contributor, but reason and justice seem to be on the side of the Courts that hold that such a person is disqualified. It was so held in Jackson v. Sandman, 18 N. Y. Suppl. 894, 64 Hun. 634; Respublica v. Richards, 1 Yeates (Pa.) 480; State v. Fullerton, 90 Mo. App. 411. In Commonwealth v. Livermore, 4 Gray (Mass.) 18, the Court said: "We deem it to be our duty, however, to say that, in our judgment, the members of any association of men, combining for the purpose of enforcing or withstanding the execution of a particular law, and binding themselves to contribute money for such purpose, cannot be held to be indifferent, and therefore

ought not to be permitted to sit as Jurors, in the trial of a cause in which the question is, whether the defendant shall be found guilty of violating that law."

In an early English case it was held that when a prosecution was instituted by the Society for the Suppression of Vice, it was held that the defendant was entitled to be furnished with a list of the persons who were members of the society, so that on the call of the panel of the Jurors, any one who admitted he was a member of the society might be set aside. Reg. v. Nicholson, 8 Dowling 422, 4 Jurist 558.

As this precise question, however, is not involved here we do not pass on it at the time. The question now presented, the qualification as a Juror, of a person who has contributed to a fund to employ an attorney to assist in the prosecution of the *identical person charged with the offense*—is a much stronged one. A person who employs or contributes money for the employment of an attorney to represent one side of a cause, must necessarily believe in the justice of that side, which he so greatly desires to have prevail that he is willing to contribute money towards its success, is not unbiased or without prejudice. One of the surest tests of a man's belief in and devotion to a cause is his willingness to contribute money for its success and it would be a mockery of justice to permit such a person to insure that success by serving as a Juror in the cause.

In the case of State v. Moore, 48 La. Ann. 380, 19 South. Rep. 285, the Court said: "In the attitude of the contributor, it must seem difficult to maintain his fitness as a Juror in a case the prosecution of which he has enlisted his zeal so distinctly manifested by his money contribution." See State v. Sultan, 142 N. C. 596, 54 S. E. Rep. 841; reported in 9 Ann. Cases 310. See also Boyle

v. People, 4 Colo. 176; Starke v. State, 17 Wyo. 55, 96 Pac. Rep. 148.

A number of veniremen admitted having sub-scribed to the fund, and one of them was per-mitted to serve on the Jury. This was brought to the attention of the Court by the defendants during the progress of the trial, by a motion for a mistrial which was denied. A motion for a mistrial was also made on the ground that two of the Jurors, who had sworn on their *voir dire* that they had formed or expressed no opinion of the guilt or innocence of the accused and could give them a fair and impartial trial, had stated that they had kept up with the case and that if the evidence was so reported that they (referring to the defendants) "should hang, and that they should be con-victed."

There were about one hundred veniremen examined before a Jury was obtained, more than a third of whom admitted that they had formed or expressed opinions concerning the guilt or innocence of the accused.

On the examination of the veniremen A. A. Allen, he swore as follows: "Well, of course, the general rumor of the settlement, the whole case was going against them." "Q. According to the rumor of the settlement the whole case was going against them?" "A. Yes, sir." "Q. Well, did you believe the general rumor of the settlement?" "A. I had to, it was the general rumor." "Q. Then you had formed an opinion as to the guilt or innocence of these men?" "A. Yes, sir."

One of the purposes of a motion for a new trial, is to afford an opportunity for the Trial Judge to correct any prejudicial error which he may have committed in the progress of the trial of a cause. If the Judge was not satisfied from the uncontradicted array of facts con-

tained in the affidavits offered by the defendants to show prejudice in the County, the developments in the examination of veniremen, and the matters brought to his attention during the trial of the cause, were sufficient to carry conviction that the change of venue should have been granted and the motion for a new trial that contained this ground, was improperly denied.

After a most careful examination of the testimony, we are unable to say that the verdict could properly have been found, notwithstanding the errors that we have discussed. The nature and character of the testimony and the conduct of the trial make it extremely prob lematical.

Without the testimony of Mrs. Eliza Atwell, the State's case would have fallen to the ground, and even if it be accepted as true, she does not say that either of the Blackwells admitted to her that they had killed the Davises. Her only direct testimony on that point is that Will Blackwell said to her "We have killed old man Bud Davis," and that she said to him "Will, you didn't do that?" and he replied, "No, I didn't, but the boys did."

This witness and her daughter, Fannie, testified at the Coroner's inquest and established a complete alibi for Will Blackwell. She swore that he had been rooming and boarding with her for a year before the murder, and was at her home, about twenty-five miles from the scene of the murder, at an hour that made it impossible for him to have been there on that night. She said he had been away all that day and brought back three small fish which she cleaned and put away, but that a cat got them; she told him this the next day at dinner time when he asked about them. She testified at the Coroner's inquest that when Will Blackwell came home about half past seven or eight that night his clothes were wet from

a drizzling rain that was falling, and that she went into the room occupied by a man named Babcock to get him some dry clothing. This she denied on the trial, but her former testimony was corroborated by Babcock who testified that she came to his room and told him that she came to get some dry clothing which was in there. He said he heard the conversation at dinner time the next day about the cat getting the fish; he further testified that he heard a man in conversation with her about eight or nine o'clock on the night of the murder, and the next day when he heard Will Blackwell talking, he recognized his voice as like that of the person whom he heard talking the night before. Fannie Atwell testified before the Coroner's inquest to the same effect as her mother. Both of them on the trial repudiated their former testimony, and gave most damaging testimony against the defendant Will Blackwell. About a week after the arrest of Will Blackwell, Eliza Atwell was locked up on the charge of being an accessory to the murder, was kept in jail three weeks and released on bail, and had not been placed on trial at the time the Blackwells were tried. Both Eliza and Fannie Atwell brazenly claimed on the trial to have committed perjury at the Coroner's inquest. Fannie Atwell says she swore to lies because her mother told her to do so, and the mother says that she swore to lies because Will Blackwell had threatened her. She attempts to justify her alleged perjury at the Coroner's inquest by saying that she did it in "Self defense," and that she was afraid to tell the truth at the inquest, but was not afraid on the trial because Will Blackwell was in jail and she had protection. She admits, however, and it is a fact, that Will Blackwell was in jail at the time she testified before the Coroner. She attempts to reconcile the absurdity of her reason for

10—Vol. 76.

changing her testimony by saying that he told her that the "other boys would make it bad for her." There is nothing in the record to show who these imaginary boys were, nor that their ability to do her harm was not as great at the time of the trial, as when she testified at the Coroner's inquest.

A. J. Melvin testified that he saw Robert Blackwell on a railway train at Holts bound for Pensacola about 7:30 P. M. on the night of the murder, which made it impossible for him to have been present and participating therein.

Mrs. Erin Settles testified that Will Blackwell was at her house about twenty-two miles from the scene of the murder the night it was committed. She and Melvin were arrested for perjury in the presence of the jury and before a warrant had been issued for them. The purpose of these spectacular arrests was to discredit these witnesses with the jury.

Several days after the arrest of Melvin, he had a change of heart and came back into court and repudiated his former testimony.

Matthew Wilson and Jim Sellare, witnesses subpoenaed for the defendants, were arrested and put in jail charged with being accessories to the murder. Sellare was kept in jail until he was taken to court to testify, when he contradicted the testimony of Robert Blackwell, who said that he had occupied a room with Sellares in Pensacola on the night of the murder. Matthew Wilson on several occasions while in jail denied to the Detective Moore, having seen Will Blackwell after his escape. After being in jail several days and holding several conversations with the detective, he had one with him and Mr. Sutton, and he says, "They told me if I would tell just exactly how it was, they would turn me out," and he then went

into court and testified that he had seen. Will Blackwell and had conversations with him in which Blackwell made damaging admissions to him.

The method resorted to in this case of putting witnesses in jail on charges of perjury, or of being accessories to a murder in order to make them tell the truth, is fraught with the danger that persons who need this spur to their veracity, may be willing to swear falsely to save themselves. Torture was anciently applied to prisoners to make them confess their guilt, but it is not now often openly resorted to, as experience proves that men will confess to crimes they did not commit to free themselves from pain. Much more readily will a person in great fear for himself, implicate another to save himself.

The effect of these arrests was to strike terror to the hearts of all these persons, and the vague intangible fear of some imaginary "boys" that Eliza Atwell said was her reason for committing perjury before the coroner, was far less potent than the present impending danger of a prosecution as accessory to a murder, where public sentiment ran high and where the terror of such a situation was accentuated by incarceration in jail. Eliza Atwell recanted through fear of something which existed to the same extent when she testified on both occasions, and Melvin recanting because of a change of heart and the promptings of a sensitive conscience. While moral suasion or a bleeding conscience may perhaps sometimes cause the wicked to recant, imprisonment and danger of conviction for perjury, or as accessory to a murder, are much more powerful influences. In such a plight Galileo recanted, and the record in this case does not disclose that Eliza Atwell, A. J. Melvin and Matthew Wilson were

superior in mind, character, conscience, courage or morals to the great astronomer.

Mrs. Erin Settles was subsequently tried and convicted of perjury committed when testifying for the defendants in this cause. She did not recant, and subsequently when testifying in her own behalf, she stated that while she might have been mistaken about the night when Blackwell was at her house, that she still believed that it was on the night that the Davises were killed. Her conviction was affirmed by this Court, and the writer of this opinion concurred in it, because the testimony was conflicting and the jury having found against her was reluctant to disturb the verdict. If the record in the instant case had been before the Court at the time Mrs. Settles' case was disposed of, the writer of this opinion would not have concurred in that judgment.

The record in this case bristles with statements and proceedings prejudicial to the defendants which in the aggregate amounted to a denial of such a fair and impartial trial as every person is entitled to under the Constitution.

While we will not undertake to recite all the improper remarks and proceedings that appear in the record, we will advert to some of them. On cross-examination, Sheriff Sutton was asked if he had not repeatedly said he would "break their necks;" to which he replied, "Well, I said if the law said so." He also volunteered the information that he said he "had the evidence." On re-direct examination the following testimony was placed before the jury by the Assistant State Attorney: Mr. Stokes: Q. "You said you thought you had the evidence to do so?" A. "Yes, sir." Q. "You still think so?" A. "Yes, sir. Q. "You still think you have the evidence before the jury?" A. "Yes, sir."

· Although there was no objection by the defence to this opinion of the Sheriff that there was sufficient evidence before the jury to convict the prisoners, it was so flagrantly improper, that it should have been stricken by the Court of its own motion. But it remained in, and the jury carried with them into the jury room the opinion of the Sheriff, who is a man of great influence in the county, that there was sufficient testimony before them upon which to find a verdict of guilty.

On the trial a motion was made to have the shackles removed from the prisoners while in the court room on trial, and for the appointment of an elizor to take charge of them, because of the bitter feeling of the Sheriff towards them, and their fear of him. To this Mr. Stokes objected, announcing in the presence of the jury, "We want no more escapes." At this time there was no testimony before the jury that Will Blackwell had escaped or attempted to escape. When Will Blackwell testified about being at a place in the vicinity of the scene of the murder, some time before, Mr. Stokes asked him, "Did you tell him that you were campaigning when you were working for Mr. Knott?" We are not without knowledge that during the greater part of 1916, this State had gone through one of the hottest political contests that had been waged since the days of reconstruction, and feeling ran high between the supporters of two contesting candidates for Governor, one of whom was Mr. Knott. The fact that Will Blackwell was a supporter of Mr. Knott was twice brought to the attention of the jury by the Assistant State Attorney. It is not necessary to comment on the purpose or possible effect of twice injecting this into the testimony. Will Blackwell was asked at whose house he stayed on a certain night after his escape, and he replied, "I can't tell on my friends." He was then told

by the court, "Answer the question," to which he replied, "I can't answer the question. I can't tell on my friends. I would rather go to jail and stay there before I would do that." At another period in his testimony he again stated, "I told you I wouldn't tell on my friends." The Assistant State Attorney then invoked the aid of the court to require him to betray his friends, and the judge replied, "The Court can't do anything more than put him in jail and he is already in jail," Blackwell then said, "The jail is his strongest weapon," and the Assistant State Attorney said, "No the strongest weapon is the gallows." At another point in the taking of the testimony, the Court in overruling an objection by the State to testimony in behalf of the defendants, said: "It can go in for what it is worth." This remark by the Court tended to discredit the testimony in the minds of the jury.

Robert Blackwell testified that Jim Sellars occupied a room with him in Pensacola the night of the murder and on cross-examination of the former, the Assistant State Attorney asked him, "Do you know that Sellars was suspected of being the third man with you and Will?" and "Do you know that Sellars had a bad reputation?" Sellars, after being incarcerated as an accessory to the murder, testified in behalf of the State.

In the examination of Will Blackwell he was asked by the Assistant State Attorney: "Were you in jail for poisoning a man in Tennessee?" "Weren't you in jail for selling whiskey?" "Did you steal that pistol from Mr. A. F. J. Smith at Holts?" Blackwell answered these questions in the negative, and no testimony was offered by the State to contradict him or in support of the insinuations contained in the questions.

When the physician who examined Will Blackwell's physical condition, testified that he had only "one lung

and that his heart was bad," the Assistant State Attorney said to him in the presence of the jury, "You didn't examine his conscience while you were examinging his physical condition?" This statement and one or two other improper ones made by the Assistant State Attorney tending to prejudice the jury against the prisoners were stricken from the record after the harm had been done, but at no time did the judge admonish the Assistant State Attorney about the impropriety of such remarks and instruct him to discontinue them.

The record contains about 1200 pages of testimony, the greater part of which consists of irrelevant and immaterial matter. On the part of the State there was a very considerable portion that was not properly in cross, but was admitted over the objection of the defence; but when Will Blackwell asked one of the State's witnesses on cross-examination a question which he thought might be helpful to his defence, it was objected to by the State as not "properly in cross," and the Court sustained the objection. When Will Blackwell was on the stand in his own behalf he was interrogated by one of the jurors about his escape, and in giving his explanation of it he said: "After they made the proposition to me in Pensacola, I knew if I couldn't get a change of venue the conditions were such I didn't have no chance to have a fair trial, and I knew it. I knew I couldn't possibly have a fair trial; they forced me to trial without any chance to make my defence; without any witnesses; I thought Mrs. Atwell was going to be a witness all the time until I came up here and was arraigned. I saw I was going to be convicted. I thought before that she was going to be a witness for me, and I knew I could not be convicted with three witnesses in my own home to swear .........."
He was then interrupted by the Assistant State Attor-

ney, who said the defendant might reserve his argument until all the evidence was in, and the Court of its own motion said to the prisoner, "Just answer the question."

Throughout the trial the greatest latitude was allowed the Assistant State Attorney, but the defence was held to the strict rules of evidence and procedure.

We consider it necessary to call attention to these matters so that another trial of the defendants may be free from similar improprieties.

The judgment is reversed and a new trial awarded.

TAYLOR AND ELLIS, J. J., concur.

WEST, J., disqualified.

SIMMONS, Circuit Judge, *dissenting.*—The first error found by the majority is developed under the second assignment, which questions the refusal of the Court below to grant a change of venue. The motion for a change of venue was based upon the alleged prejudice of the Presiding Judge and the ill-repute of the defendants in Okaloosa County. This motion was made under the provisions of Section 1471, of the General Statutes of 1906, which provides that the opposite party may deny the truth of any allegation of the motion except the allegation that the Trial Judge is prejudiced, when such allegation is made.

The State did traverse the truth of the allegation that the defendants were so odious in Okaloosa County as to prevent them from securing an impartial Jury. The Court took testimony upon the issue thus made, and decided it against the defendants. The testimony amply sustained this decision, and its correctness was further attested by the procurement of a Jury of twelve good

and lawful men accepted by both parties. Roberts v. State, 72 Fla. 132, 72 South. Rep. 649.

The Statute under consideration concludes with these words: "Such application shall fully and distinctly set forth the facts upon which the same is founded." In other words, it is not sufficient merely to say that the defendant is odious, or that the Presiding Judge is prejudiced. These statements would be mere conclusions. The facts must be stated, so that the Court may intelligently pass upon the motion. Otherwise, a defendant charged with a serious offense, or even a hard-pressed defendant in a civil suit, might trifle with the Court and the law and bandy the case around from Court to Court in the hope that time and circumstance might mitigate the inclemency of his plight.

Defendants' counsel recognied this principle of law, and undertook to state the facts upon which the allegation of the Judge's prejudice was based. These facts are stated as follows: "That the Judge of the said Court; without other or further reason than that the people of the County of Okaloosa demanded 'speedy justice' and no delay of the law, acting at the behest of such public sentiment, has called this special term of Court to try the said defendants, when according to the Statutes of the State of Florida, the regular fall term of said Court would commence on the last Monday in August of this year."

Section 1471 of the General Statutes of 1906, *supra*, requires that the facts showing the Judge's prejudice must be set forth. If the sworn application for change of venue states facts which, if true, would require a change of venue, these facts cannot be disputed. But if the facts stated are not sufficient, admitting their truth, to require a change of venue the Trial Judge may ignore

them. Therefore, the facts set forth in the above quota-tion are admitted, and the question is, do these admitted facts show the Presiding Judge to be disqualified by reason of prejudice against the defendants?

Section 1813 of the General Statutes of 1906, provides as follows: "The Judges of the Circuit Courts are au-thorized to order and hold extra and special terms of said Courts whenever in their judgment the public wel-fare and the cause of justice require the same." Did the Judge in the case at bar act from any other motive than that here setforth by the Legislature? Comparing the language of the application for a change of venue with this last quoted Statute, it seems to me that the phrases "the public welfare" and "no delays of the law" are closely akin, as also often may be "the cause of jus-tice" and "speedy justice."

A revolting crime had been committed in Okaloosa County, and the people very naturally demanded "speedy justice." They wanted a Grand Jury empaneled, in the first place, while all the evidence was available; and at the time the special term of Court was called they very naturally wanted the case tried before one or both of the defendants had further opportunity to escape, as one of them had done at the former trial. That the Pre-siding Judge knew of these public sentiments, and was influenced by them in calling a special term of the Cir-cuit Court, is not equivalent to prejudice against the defendants personally.

In the case of Purvis v. Frink, 55 Fla. 715, 46 South. Rep. 171, this Court said the Statute here under consid-eration "must be construed to mean that prejudice which will lisqualify a Judge must be a prejudice against a party to the cause, and not a prejudice based upon the possible incidental opinions and views." "Prejudice,"

in the sense in which the word is employed here, means such a state of mind of the Presiding Judge that it may be said he has prejudiced the case and come to the conclusion that the defendant is guilty. The mere fact that he has been influenced by outraged public sentiment in the calling of a term of Court to try parties accused of horrible crime does not by any, manner of means show that he has prejudiced the case and reached the conclusion that the defendants were guilty of that crime.

The majority opinion holds that when a Circuit Judge convenes his Court in special session for the purpose of trying a defendant accused of a revolting crime, he thereby manifests such prejudice as disqualifies him and sends the case to another County for trial. For the reasons already stated, I cannot concur in this holding. As I have pointed out, the Legislature has provided for such special terms, and, so far as I am able to ascertain, the convening of them has never before been held to prove the prejudice of the Presiding Judge.

The further holding that the application for change of venue on the ground that the Presiding Judge is prejudiced against the applicant need state nothing further than the conclusion that he is prejudiced, considered in conjunction with Section 3998 of the General Statutes of 1906, which provides for additional changes of venue on the same ground, will, in my opinion, so ensnare the feet of justice that swift legislative action will be necessary to save the Courts from disrespect and ridicule. In the case of Purvis v. Frink, *supra,* the application for change of venue stated that the Judge was prejudiced and undertook to state facts showing that he was prejudiced; but this Court held that the showing of fact was not sufficient to support the general allegation. In the body of the opinion in that case these words appear:

"It will be observed that the application for change of venue nowhere alleges any facts tending to show any prejudice on the part of the Circuit Judge ........" And in a brief concurring opinion Mr. Justice TAYLOR pointedly states the matter thus: "The application for change of venue states in general terms the legal conclusion that the Judge is prejudiced, but when the facts are stated that comprise this alleged prejudice, they do not even tend to show any prejudice on the Judge's part * * *."

Men accused of crime ought not to be illegally tried and convicted to save them from a mob, nor should any man be tried by a prejudiced Judge; but a judicial holding that a special term of Court cannot be called without disqualifying the Judge who calls it from trying defendants accused of heinous crimes, and that the defendant may transport his case from Court to Court upon his bald, unsupported and unexplained statement that the several Presiding Judges before whom he comes are prejudiced against him, can but add to the public impatience of the law's delays, and cause fresh outbreaks of mob violence.

The several remarks in reference to the Pardoning Board and the Supreme Court injected into the case by the Assistant State Attorney were indecorous and irrelevant, to be sure; but I cannot hold as fatal error the refusal of the Presiding Judge to strike them. Every normal man in the State knows that there is a Supreme Court and a Pardoning Board, and that practically all capital cases are reviewed by both of these tribunals; and a reminder of their existence could not have materially influenced the Jury in the performance of their sworn duty.

As to the testimony of John Helverston concerning old man Saunders and his dog, it is a close question whether it might merely show a *tendency* of the defendants to commit violence against old people having money, which would be improper evidence, or whether it might have gone to show a general plan and purpose to commit several such crimes; this latter especially in view of overwhelming testimony that Will Blackwell had tried to enlist the help of several other men, at different times, in violently taking money from old people, including the Davis couple for whose murder he was on trial. As an abstract proposition of law, evidence going to show the *tendency* of the defendant to commit crimes similar to the one for which he is on trial is improper. Whar. Crim. Ev. (10th ed.) p. 247, and cases there cited. But there are some notable exceptions to this rule, and one of those exceptions was elucidated by this Court in the case of Wallace v. State, 41 Fla. 547, 26 South. Rep. 713. In this case Mr. Justice CARTER, after stating the rule proceeds as follows: "All the authorities concur in the view that evidence of defendant's acts prior or subsequent to the alleged offense which logically tend to prove the criminal intent, or guilty knowledge, where they are material, is admissible; and likewise where the crime in question is one of a system of criminal acts occurring so near together in point of time and so nearly similar in means as to lead to the logical inference that they are all mutually dependent and committed in pursuance of the same deliberate criminal purpose and by means planned beforehand, evidence of such other acts is admissible, even though those acts amount to another criminal offense." Presley v. State, 63 Fla. 27 South. Rep. 605.

But even admitting that this particular testimony was

irrelevant, all the sting was taken out of the error when, as stated in the majority opinion, it developed that Will Blackwell probably wanted the dog killed so that he could go to see a young woman living in the Saunders house.

The majority opinion seems to have been largely in-fluenced by the general attitude of the judge and State Attorney during the trial of the case, and a number of instances are pointed out as amounting to unfairness. The assistant State Attorney, who had active charge of the case, was evidently convinced beyond doubt of the guilt of the defendants, and he prosecuted them with zeal and vigor. In the heat of the contest he said and did many things that he ought not to have said and done, and that he probably would not have said and done in calmer moments, some of these things being pointed out in the majority opinion. It is also true that the presid-ing judge was strikingly lenient with the acting State Attorney in his rulings, and that at many points where he had discretion he exercised it in behalf of the prose-cution. But I do not believe it can be said that he abused his discretion to such a point that the defendants were thereby injured.

The general attitude of the judge and State Attorney may not support an assignment of error, nor is there any attempt to assign it as error. And, as I understand it, the province of this court is to review cases only upon assignments of error.

It is also true that the testimony was conflicting— as is to be expected in cases of this kind; but the law constitutes the jury the judges of conflicting testimony, and a jury has exercised that function in this case. The verdict of guilty is supported by evidence which the

jury had the right to consider to the exclusion of all other.

Unless wholesale perjury has been committed on behalf of the State, Will Blackwell's guilt appears to be established beyond a reasonable doubt. A jury who saw the witnesses and heard them testify decided that Robert Blackwell also was guilty, and there was testimony legally sufficient to support this decision, which has also been approved by the presiding judge in denying the motion for new trial, one ground of which is that the verdict is not supported by the evidence.

For these reasons I cannot concur in the majority opinion.

WHITFIELD, J., concurs.