[Crim. No. 3735. In Bank.—October 1, 1934.]

THE PEOPLE, Respondent, v. JUSTO RAMERIZ, Appellant.

Edward L. Davin for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

CURTIS, J.—The defendant, Justo Rameriz, was convicted in the Superior Court of the County of Los Angeles of first degree murder. The verdict being without recommendation, the court below entered judgment imposing the death penalty. Defendant appeals from the judgment and from the order denying his motion for a new trial.

The first ground urged for a reversal is that the homicide was committed in self-defense and that the verdict of the jury that the homicide was not justifiable is contrary to the evidence. In order to uphold this contention, it would be necessary for this court to wholly ignore the testimony of five witnesses for the prosecution who were eyewitnesses to the shooting of the deceased by defendant, and accept as true the testimony of the defendant, which in many of its details was inherently improbable.

The facts of the case, as shown by the evidence adduced by the prosecution, are substantially as follows: Luis Flores, a young man of Mexican nationality, married and the father of two small children, was living with his family near Van Nuys in the San Fernando Valley in the community known as Canoga Park. On May 5, 1931, which was a Mexican national holiday, defendant and deceased had had a fight. Two months thereafter, and on July 5, 1931, which fell on Monday and was a holiday because the 4th of July fell on Sunday, between the hours of 1 and 2 o'clock in the afternoon, a fist fight was in progress in the alley near the vicinity of the Flores home. Some fifteen or more Mexicans were spectators, and there was considerable excitement and confusion in the neighborhood. The combatants were Manuel Ybarra and Manuel Bracamonte. These participants had no connection with either the deceased or the defendant. The brother of Manuel Ybarra was endeavoring to separate the combatants, and there is some evidence that the deceased Flores was also endeavoring to separate them. During the progress of the fight and during the confusion and commotion, the defendant arrived on the scene in an automobile accompanied by one or more of his brothers and another person. The defendant parked his car some distance up the alley and proceeded to the scene of the fight. There, according to the testimony of five eyewitnesses, he shot Flores with a pistol without any warning. The first shot took effect in Flores' arm near the elbow. Flores grabbed his elbow and turned toward the defendant, who then fired a second shot, which struck Flores in the neck passing through the right carotid artery and severing the spinal cord. Flores died an hour later in the Van Nuys receiving hospital. Immediately after firing the second shot, defendant walked over to the automobile and drove away and immediately fled from Los

Angeles County. He was apprehended two years later at Sacramento. When arrested he denied that he was Justo Rameriz, the defendant wanted for murder, and insisted that he was his brother. Later, upon being positively identified by the wife of the deceased and by another person as Justo Rameriz, he admitted his identity.

The account of the homicide, as testified to by defendant, is as follows: He testified that he was driving around on the day in question when his attention was attracted by the fight; that he and Flores, despite their former bad blood, had become friends, and that he tried to induce Flores to leave the scene of the fight because he was afraid Flores might get hurt; that Flores resented his interference and pulled an empty whisky bottle from his right hip pocket and hit him, the defendant, on the forehead, breaking the bottle and causing his head to bleed slightly; that Flores then pulled out of the same hip pocket a gun and tried to shoot defendant; that defendant struggled with Flores for possession of the gun; that he managed to gain possession of the gun and started to run away but was pursued by Flores who had pulled an open knife out of his left hip pocket and started to pursue him; that then, in self-defense, he turned and shot Flores with Flores' own gun. It should be noted in connection with defendant's testimony that the testimony of the police officer who investigated the homicide, and who arrived at the scene very soon after the shooting, was to the effect that there was no blood other than at the place where Flores' body lay, that Flores had nothing in his hands, and that no knife was found at or about his body or on the premises; that there were no fragments of a broken whisky bottle; and that when they searched Flores' body as they placed him on the stretcher, they found no weapons of any kind or character upon him.

It is true that evidence in behalf of the prosecution is not free from some uncertainties and particularly in regard to the discrepancies between the testimony of the wife of Flores and that of the surgeon who performed the autopsy. The latter testified that the shot in the deceased's arm entered the fore part of the arm, and that the exit wound was at the back of the arm, indicating that the deceased was facing the defendant at the time the first shot was fired. Mrs. Flores testified that the defendant shot the

deceased while the deceased's back was toward him. While this discrepancy might indicate that the defendant shot the deceased while the deceased was facing him, it does not lessen to any extent the fact that five eyewitnesses all testified that defendant, without any provocation whatever, approached the deceased firing upon him with fatal result.

The defendant's testimony was corroborated by a witness for the defense, but it is quite apparent that the jury entirely discredited the testimony of both the defendant and his corroborating witness. The jury accepted as true the testimony of the five eyewitnesses for the prosecution, and in view of the fact that the defendant's explanation was wholly discredited by a failure on the part of the police officer to find any knife, broken glass or weapon of any kind at the scene of the homicide, we feel that the jury was amply justified in reaching the verdict which it did. ''The credibility of the witnesses was, in the first instance, a matter solely for the jury to determine; and finally, upon the hearing of the defendant's motion for a new trial, it was the right and duty of the trial judge, in weighing the sufficiency of the evidence upon which the verdict was had, to consider the credibility of the witnesses. The trial judge's determination of the question of such credibility is conclusive upon us.'' (*People* v. *Martin*, 19 Cal. App. 295, 299 [125 Pac. 919]; *People* v. *Kawamoto*, 216 Cal. 531, 534 [15 Pac. (2d) 153].) There is an abundance of substantial evidence justifying the verdict of the jury in the instant case.    All conflicts in the evidence having been resolved against the defendant by the jury in the first instance, and by the trial court upon its denial of the motion for a new trial, and such evidence being sufficient to support the verdict, it is not the province or the privilege of this court to weigh the evidence, nor to pass upon the credibility of the witnesses. (*People* v. *Tom Woo*, 181 Cal. 315, 326 [184 Pac. 389]; *People* v. *Kawamoto, supra.*)

   The second ground urged for reversal, that as a matter of law the facts proved do not support a verdict of murder in the first degree, is, we think, completely answered by a mere recital of the facts testified to by the five witnesses for the prosecution. Their testimony shows that the defendant deliberately drew his gun and shot the deceased without warning, and that after the first shot took effect

in the elbow of deceased, defendant fired the second shot which was fatal. The facts and circumstances surrounding the shooting indicated a deliberate and malicious intent to take human life. If defendant was guilty at all, he was guilty of murder in the first degree.

There is no merit in the third objection that the substantial rights of the defendant were prejudiced by the failure of the court to instruct the jury on murder in the second degree. It appears that the jury was instructed on the question of second degree murder in the language of section 189 of the Penal Code. This instruction must be accepted as correct. The following instruction was also given: "In dividing murder into degrees the test may be stated: Is the killing willful (that is to say, intentional), deliberate and premeditated? If it is the case falls within the first; if not, within the second degree." Complaint is made by appellant that another instruction defining second degree murder was erroneous in that it ignored the elements of premeditation and deliberation which were necessary elements of murder of the first degree, and instructed the jury that if a specific intent existed in the mind of the slayer to take life, the offense committed would be murder in the first degree. This same identical instruction was given in *People* v. *Leddy*, 95 Cal. App. 659, 670, 671 [273 Pac. 110], and the same objections thereto were made. The court there held that, "the court in its other instructions fully defines murder of the first and second degree, and manslaughter, and the elements constituting those offenses. Therefore, read in connection with the other instructions, the instruction complained of constituted a correct statement of the law." In view of the other instructions in this case, we are satisfied that the defendant's rights were not prejudicially affected by the instruction complained of.

The most serious objection made by appellant is that the district attorney was guilty of prejudicial misconduct in his address to the jury when in his plea for a verdict of guilty of first degree murder without recommendation, he stated that, "It is a matter of common knowledge as to what length of time this life imprisonment is in California." He further stated, "It is a matter of common knowledge, and there are statistics compiled which show the appalling

few years that the average man spends in the penitentiary for first degree murder when life in the penitentiary is recommended." This was cited as misconduct by counsel for the defense but the court refused to instruct the jury to disregard the statements saying, "I will not so instruct the jury, that matter has been discussed in a case by the Supreme Court." It is indeed unfortunate if the language of any decision heretofore rendered by this court erroneously gave the impression that such statement was permissible, or that the district attorney was within his right in making such statement. In both cases of *People* v. *Reilly*, 208 Cal. 385 [281 Pac. 606], and *People* v. *La Verne*, 212 Cal. 29, 31 [297 Pac. 561], it was pointed out that expressions of this kind should be avoided by overzealous prosecuting officers. In view of the record in both of those cases, it was held by the court that the verdict would have undoubtedly been the same, and such statement was, therefore, held not to be reversible error. Because of the record here, we are constrained to hold likewise that such statement is not reversible error. In so holding, however, we feel that it should be definitely understood that such statements are not approved by this court, and that under a different state of facts serious error may be predicated upon such misconduct.

The judgment and the order denying a new trial are affirmed.

Langdon, J., Shenk, J., Seawell, J., Preston, J., and Waste, C. J., concurred.