[Crim. No. 7339. In Bank. Jan. 7, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. · JOSEPH
BERNARD MORSE, Defendant and Appellant.

634

William B. Enright, under appointment by the Supreme Court, and Harelson, Enright, Von Kalinowski & Levitt for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—This case involves an automatic appeal under Penal Code section 1239, subdivision (b), following verdicts finding defendant guilty of two counts of murder in the first degree and imposing the death penalty.

The three separate counts of the indictment charged defendant with the murder of his mother and sister and with assault upon the person of one Ellen Young. To these counts defendant entered a plea of not guilty and not guilty by reason of insanity. Finding defendant both guilty and sane, the jury imposed the death penalty for each of the murders. The trial court thereafter denied defendant's motions for a new trial and for reduction of penalty.

Defendant, a young man of 18½ years, became involved, prior to the murders, in an incident with a Miss Young. He

first encountered her on a bus when, in the early hours of a Sunday morning, he was returning to his home. She alighted from the bus, and defendant followed her. After she had walked several blocks, defendant accosted her, taking her purse and beating her about the head and shoulders. When Miss Young screamed, defendant returned the purse and apologized, but continued to molest her until she took refuge with the occupants of a nearby dwelling.

Defendant then went to his home, where he lived with his mother and a 12-year-old sister who suffered from cystic fibrosis. Somewhere outside the house he picked up a rock, concealing it under his shirt. His mother let him into the house. When his mother returned to her bedroom he called to her on some pretext, anticipating that she would get out of bed and come to the bedroom door. When she opened the bedroom door he was waiting in the hall; he hit her with the rock and killed her. The struggle awoke his sister and she started "yelling or something"; he struck her; later he secured a baseball bat from the kitchen closet and beat her until she was quiet.

When defendant related this episode to the police, he said he had felt the urge to kill or "snuff" someone, a recurrent urge with him. That night he had intended to kill his mother as well as the girl on the bus. The identity of his victim was of no consequence.

After the commission of the crimes, defendant roamed the city in the family car in search of companionship, but he found none. He considered and rejected suicide; he thought, too, of the possibility of successfully disposing of the bodies and decided that it would be futile. He did not sleep at all that night but finally about 4 or 5 p.m. on Sunday he visited the home of his sister-in-law, Gail Morse, and her mother, Mrs. Keating, whom he informed that he had found his mother and sister dead. Mrs. Keating sought the assistance of a neighbor who was a police officer; he called other officers to meet him, and they escorted defendant back to investigate the crime scene. The officers found the bodies and the murder weapons, the rock and a baseball bat, on the premises just as defendant had left them.

Defendant remained phlegmatic until one of the police officers in the car transporting him to headquarters mentioned that he would give defendant a pencil and paper so that he might make notes to refresh his memory. Defendant responded: "I don't think that will do me any good, and

prison won't help me. It must be something in my head." When the officer asked whether that meant defendant had committed the murders, defendant said "Yes." At the police station defendant voluntarily responded to interrogation: the officers tape-recorded his confession; the prosecution played the tape-recording at the trial and thereafter an officer read a transcript of its contents to the jury.

At the trial defendant recanted some of the statements he had made in his confession. He asserted that he had procured narcotic drugs in Tijuana the Saturday preceding the killing and, contrary to his earlier denial, stated that during all of that evening and the next day he had remained under the influence of benzedrine and barbiturates. He denied that he felt an urge to kill but stated that he was "bombed out" from the effects of the drugs. He claimed that he kept this fact from the police because at the time of his confession he was so shaken that he wanted to die. Defendant further testified, in substance, that the crimes were not premeditated. He said that he intended merely to steal Ellen Young's purse. He was induced to strike his mother by her accusations when he tripped over the doorsill that "You are going back to jail because you are messing around with dope again." He struck his sister to silence her screams.

We consider, first, the penalty phase of the trial and explain why we have concluded that the rendition of certain instructions, the introduction of certain evidence, and the presentation of certain arguments worked prejudicial error. We then examine the guilt phase of the trial and briefly point out that defendant's four assertions of error lack merit.

A. *The penalty trial.*

■ The trial court instructed the jury that "Every person guilty of first degree murder shall suffer death or confinement in the State Prison for life in the sole discretion of the jury. ... In making your determination as to the penalty to be imposed, you may, in exercising your discretion to choose between different punishments, consider as a possible consequence that the law of this State provides that a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the Governor and that if this defendant is sentenced to life imprisonment he may be eligible for parole at the expiration of seven calendar years. A trial judge may also reduce the penalty from death to life imprisonment." (CALJIC No. 306 (rev.).)

Statistical evidence of the median and average time served by defendants convicted of first degree murder and of the legal minimum period of incarceration was presented to the jury by means of a stipulation.[1]

The quoted instruction illustrates the last and most extreme stage in a progression of instructions in the penalty phase of capital cases. Our present concern as to the impact of the instruction compels us to review our past rulings on this subject and to make certain that the court's statements to the jury in its tragic task do not confuse but clarify its undertaking. ■ Our original purpose in permitting the court to instruct the jury that, if it found for life imprisonment rather than the death penalty, the defendant could possibly be paroled,[2] was to afford it the pertinent facts "to assist it in assessing the significance of a life sentence"

[1]"Mr. Stahl and I are in agreement that if Mr. Joseph Spangler of the Bureau of Criminal Statistics in Sacramento, California, were called to the witness stand he would testify that studies made in the previous three year periods concerning people convicted of first degree murder would be as follows: In the year 1959 there were thirty-two cases of persons paroled. Median time served was 136.5 months; average time served was 144.3 months. In the year 1960 there were sixteen cases of parole. The median time served was 139 months, the average time served 164 months. In the year 1961 there were twenty-two cases of parole. The median time served was 141 months; average time 152 months. These are figures for male prisoners for time served before first parole. The absolute legal minimum for both sexes, men and women, before eligibility for parole is seven calendar years." As Justice Peters points out in *People* v. *Purvis* (1963) *ante*, pp. *323, 353* [33 Cal.Rptr. 104, 384 P.2d 424], these statistics fail to include "the basic facts involved"; they raise a serious question of reliability in omitting "the time being served by those still confined under a life sentence and not released."

[2]*People* v. *Hamilton* (1963) *ante*, pp. 105, 135 [32 Cal.Rptr. 4, 383 P.2d 412]; *People* v. *Purvis* (1963) *ante*, pp. 323, 350 [33 Cal.Rptr. 104, 384 P.2d 424]; *People* v. *Jackson* (1963) 59 Cal.2d 375, 378 [29 Cal.Rptr. 505, 379 P.2d 937]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 543 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 735 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Gaines* (1962) 58 Cal.2d 630, 637 [25 Cal.Rptr. 448, 375 P.2d 296]; *People* v. *Love* (1961) 56 Cal.2d 720, 726 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]; *People* v. *Purvis* (1961) 56 Cal.2d 93, 96 [13 Cal.Rptr. 801, 362 P.2d 713]; *People* v. *Robillard* (1960) 55 Cal.2d 88, 102 [10 Cal. Rptr. 167, 358 P.2d 295]; *People* v. *Scott* (1960) 53 Cal.2d 558, 566 [2 Cal.Rptr. 274, 348 P.2d 882]; *People* v. *Chessman* (1959) 52 Cal.2d 467, 495 [341 P.2d 679]; *People* v. *Purvis* (1959) 52 Cal.2d 871, 884 [346 P.2d 22]; *People* v. *Turville* (1959) 51 Cal.2d 620, 634 [335 P.2d 678]; *People* v. *Ward* (1959) 50 Cal.2d 702, 711 [328 P.2d 777, 76 A.L.R.2d 911]; *People* v. *Friend* (1957) 47 Cal.2d 749, 754 [306 P.2d 463]; *People* v. *Riser* (1956) 47 Cal.2d 566, 582 [305 P.2d 1] ; *People* v.

(*People* v. *Purvis* (1959) 52 Cal.2d 871, 885 [346 P.2d 22]).[3] Although such information may have been relevant, the instruction, abetted by the introduction of evidence as to the possibility of parole, has brought about untoward consequences to defendants. It has brought in its wake a trend of unremitting expansion in the scope of argument and evidence presented to the jury that has coincidentally produced and augurs future confusion.

The very introduction of the fact that a prisoner sentenced to life imprisonment became eligible to parole after seven years inevitably led to ramifications. Confronted with this bare instruction, defense counsel first countered by adducing evidence that the average and median sentences of defendants sentenced to life terms actually ran longer than the minimum of seven years.[4] This evidence, in substance, may have induced some juries to weigh the alternative of a sentence of a particular *number of years,* rather than a life sentence, against the death penalty. In any event, the fear that such was the case induced defense counsel to attempt to reassure the jury that the Adult Authority properly performed its task of deciding whether a defendant should be paroled, and if so, when he should be granted parole. Thus defense counsel developed the practice of calling officials from the Adult Authority as witnesses to testify to the qualifications and background of its membership, the procedures and considerations involved in granting paroles, and the statistical showing of recidivism of prisoners released on parole.

The reaction by prosecuting attorneys to these developments took the form of an attempt to emphasize to the jury the possibility of error by the Adult Authority and the potential grievous harm that might result from the inadvertent

---

*Green* (1956) 47 Cal.2d 209, 216 [302 P.2d 307] ; *People* v. *Reese* (1956) 47 Cal.2d 112, 116 [301 P.2d 582]; *People* v. *Byrd* (1954) 42 Cal.2d 200, 206 [266 P.2d 505]; *People* v. *Barclay* (1953) 40 Cal.2d 146, 158 [252 P.2d 321]; *People* v. *Osborn* (1951) 37 Cal.2d 380, 384 [231 P.2d 850] ; cf. *People* v. *Caetano* (1947) 29 Cal.2d 616 [177 P.2d 1]; *People* v. *LaVerne* (1931) 212 Cal. 29 [297 P. 561].

[3] We set forth typical expressions of the cases: "... [T]he Court may instruct the jury as to the consequences of the different penalties that may be imposed so that an intelligent decision may be made." *People* v. *Barclay* (1953) 40 Cal.2d 146, 158 [252 P.2d 321]. "The quoted rules are pertinent as matters of fact to be considered in determining the penalty. ..." *People* v. *Friend* (1957) 47 Cal.2d 749, 755 [306 P.2d 463].

[4] E.g., *People* v. *Byrd* (1954) 42 Cal.2d 200 [266 P.2d 505]; *People* v. *Barclay* (1953) 40 Cal.2d 146 [252 P.2d 321].

parole of a defendant convicted of murder. Thus the apparently innocuous step of giving instructions of the operation of the parole laws has resulted in the jury's attempted evaluation of the competency of the Adult Authority to administer the parole system. The jury sometimes lamentably has "tried" the Adult Authority (*People* v. *Purvis* (1963) *ante,* pp. 323, 352 [33 Cal.Rptr. 104, 384 P.2d 424]).

Concomitantly with permitting instructions as to the parole laws, this court accepted the procedure of informing the jury that the Governor could exercise the power, among other things, of reducing a death penalty to life imprisonment.[5] The trend in this direction, which, as we shall develop more fully *infra,* may well tend to reduce the jury's sense of responsibility, was halted momentarily in *People* v. *Linden* (1959) 52 Cal.2d 1 [338 P.2d 397]. *Linden* held it improper to inform the jury about automatic appeals in death penalty cases. The present case, however, indicates that the thrust of expansion has fully resumed. Here the jury has been informed as to the *trial judge's* power to reduce a death penalty to life imprisonment.

In the recent case of *People* v. *Purvis* (1963) *ante,* pp. 323, 352 [33 Cal.Rptr. 104, 384 P.2d 424], we expressed serious doubt as to the reliability of statistics to show the probabilities that a sentence of life imprisonment will result in parole or to indicate the time when the Adult Authority will, if at all, grant parole. Thus far we have not been confronted with a case in which statistics and evidence have been introduced to show the probabilities of the trial judge's reduction of a death sentence or of the Governor's exercise of his power of commutation. If the present trend continues such cases surely will arise.

When we opened the door a slight crack to allow an instruction, and to admit an evidentiary showing, as to the realistic consequence of a sentence of life imprisonment, we had in mind a limited and legitimate objective. But various maneuvers have pushed the door so widely ajar that too many confusing elements have entered the courtroom. The

---

[5]*People* v. *Chessman* (1959) 52 Cal.2d 467, 495 [341 P.2d 679]; *People* v. *Turville* (1959) 51 Cal.2d 620, 634 [335 P.2d 678]; *People* v. *Ward* (1958) 50 Cal.2d 702, 711 [328 P.2d 777, 76 A.L.R.2d 911]; *People* v. *Friend* (1957) 47 Cal.2d 749, 754 [306 P.2d 463]; *People* v. *Riser* (1956) 47 Cal.2d 566, 582 [305 P.2d 1]; *People* v. *Byrd* (1954) 42 Cal.2d 200, 207 [266 P.2d 505].

time has arrived for specifying the matters that the jury should consider.

Before turning to a specific analysis of the case as it is now presented to us, we note the current posture of the decisions. As to the issue of presenting to the jury the possibilities of parole, California now stands in a striking minority position among other jurisdictions,[6] although our earlier cases appeared more in accord with the majority.[7] With regard to instructing the jury as to the trial judge's power to reduce sentence, prior decisions of this court, as we shall later ex-

[6]*Lawley* v. *State* (1956) 264 Ala. 283 [87 So.2d 433]; *Scarber* v. *State* (1956) 226 Ark. 503 [291 S.W.2d 241]; *Sukle* v. *People* (1941) 107 Colo. 269 [111 P.2d 233]; *Broyles* v. *Commonwealth* (Ky. 1954) 267 S.W.2d 73 [47 A.L.R.2d 1252]; *State* v. *Henry* (1940) 196 La. 217 [198 So. 910]; *State* v. *White* (1958) 27 N.J. 158 [142 A.2d 65]; *Bean* v. *State* (1936) 58 Okla.Crim. 432 [54 P.2d 675]; *Graham* v. *State* (1957) 202 Tenn. 423 [304 S.W.2d 622] [prosecutor's argument]; *Williams* v. *State* (1950) 191 Tenn. 456 [234 S.W.2d 993] [trial court's instruction] ; *Coward* v. *Commonwealth* (1935) 164 Va. 639 [178 S.E. 797]. See *Lovely* v. *United States* (4th Cir. 1948) 169 F.2d 386; *Wilson* v. *State* (1956) 212 Ga. 157 [91 S.E.2d 16]; *Farrell* v. *People* (1890) 133 Ill. 244 [24 N.E. 423]; *State* v. *Junkins* (1910) 147 Iowa 588 [126 N.W. 689]; *Jacobs* v. *State* (1913) 103 Miss. 622 [60 So. 723]; *State* v. *Quilling* (1953) 363 Mo. 1016 [256 S.W.2d 751]; *Grandsinger* v. *State* (1955) 161 Neb. 419 [73 N.W.2d 632]; *State* v. *Conner* (1955) 241 N.C. 468 [85 S.E.2d 584]; *Liska* v. *State* (1926) 115 Ohio St. 283 [152 N.E. 667]; *State* v. *Thorne* (1912) 41 Utah 414 [126 P. 286, Ann.Cas. 1915D 90]; *Jones* v. *Commonwealth* (1952) 194 Va. 273 [72 S.E.2d 693, 35 A.L.R.2d 761]; *State* v. *Carroll* (1937) 52 Wyo. 29 [69 P.2d 542]; cf. *Deming* v. *State* (1956) 235 Ind. 282 [133 N.E.2d 51]; *Commonwealth* v. *Johnson* (1951) 368 Pa. 139 [81 A.2d 569]. *Contra, Sullivan* v. *State* (1936) 47 Ariz. 224 [55 P.2d 312]; *State* v. *Buttry* (1939) 199 Wash. 228 [90 P.2d 1026]; *State* v. *Shawen* (1894) 40 W.Va. 1 [20 S.E. 873]. See also Knowlton, *Problems of Jury Discretion in Capital Cases* (1953) 101 U.Pa.L.Rev. 1099, 1118; Comment (1954) 54 Colum.L.Rev. 946, 956-957; Comment (1953) 39 Va.L.Rev. 85; Comment (1953) 10 Wash. & Lee L.Rev. 29; Note 35 A.L.R.2d 769.

[7]The case of first impression in California apparently was *People* v. *Reilly* (1929) 208 Cal. 385 [281 P. 606] in which this court did not indicate particular favor towards the present position. The prosecutor had argued to the effect that it was a matter of common knowledge that a sentence of life imprisonment means that a defendant will serve from seven to ten years and then be "turned out" on society. This court stated "[I]t is *unfortunate* that such overzealous argument sometimes occurs in the course of a criminal trial, but no objection was made thereto nor was any request made that the jury should be admonished to disregard this statement, and, in view of the entire record in this case, we cannot say that a different result would have followed had this statement been omitted." (208 Cal. at p. 387; italics added.) See *People* v. *LaVerne* (1931) 212 Cal. 29 [297 P. 561].

In *People* v. *Letourneau* (1949) 34 Cal.2d 478 [211 P.2d 865], the

plain in more detail, indicate that such instruction constitutes error in that it tends to reduce the jury's sense of responsibility in imposing the death penalty.

We turn to an analysis of these two basic aspects of the problem: the instruction, evidence and argument as to the role of the Adult Authority, and the instruction as to the roles of the trial judge and the Governor.

jury, after a period of deliberation, inquired in writing of the trial court: " 'Does the imposition of "imprisonment in the State prison for the term of his natural life" allow of later pardon or parole and possible release?' The trial judge stated, 'that is something that is a matter for the Court. It is not, in the processes of law, a matter for your consideration ... and we will not answer it.' " This court stated: "This reply was in part correct; *the possibility of pardon or parole was not for the jury's consideration.* ... It does not appear that defendant could have been prejudiced by the fact that the trial judge, in a strictly technical sense, erroneously stated that the questions were 'for the Court' whereas the question of pardon is (at least ultimately) for the Governor ... and the question of parole is for the Adult Authority, the power of which is defined by the Legislature. ..." (34 Cal.2d at pp. 493-494; Italics added.) Unlike the more recent cases cited *supra, Letourneau* expressed no distinction between the issues of guilt and penalty as to the propriety of the jury considering parole. The court concluded with the statement: "But we must presume that the jury followed the instruction which forbade its being influenced by conjecture or public feeling, and accepted the judge's statement that is was not to consider the possibility of pardon or parole. (See *People v. Ferlin* (1928) 203 Cal. 587, 600 [265 P. 230]; *People v. Anderson* (1932) 120 Cal.App. 5, 8 [7 P.2d 202].) " (34 Cal.2d at p. 494.) The court thus approves of the prior decisions prohibiting the jury's consideration of the possibility of pardon or parole.

In *People v. Hoyt* (1942) 20 Cal.2d 306, 317 [125 P.2d 29], the jury inquired if a life imprisonment meant possible parole. The trial court answered "You have nothing to do with that." A juror then asked for "a definition of life imprisonment." The trial court answered "All I can tell you it is imprisonment in the penitentiary for the period of natural life. *What is done later by the authorities is none of our concern.*" Upholding the propriety of the trial court's remarks, this court noted that such statements could not be construed as suggesting to the jury that life imprisonment meant parole in a manner that caused the jury improperly to impose the death penalty. In *People v. Ramos* (1935) 3 Cal.2d 269 [44 P.2d 301], the jury inquired for information "in regard to the penalty if a man is given life imprisonment." (P. 272.) The defendant did not object, and the court gave information describing the parole system. This court pointed out, "The action of the court was an irregularity that has been many times condemned by this court." (P. 273.) While the court did not reverse, it stated that the instruction to the jury should have "stopped" after telling them that first degree murder entitles the jury to choose between the sentences of life imprisonment or death. See *People v. Ramirez* (1934) 1 Cal.2d 559, 564-565 [36 P.2d 628].

1. *Instruction, evidence and argument as to Adult Authority's possible grant of parole.*

Although the Legislature has, through the Adult Authority, sought to provide for the rehabilitation of criminal defendants, it has coincidentally retained the death penalty and left its administration to the unguided discretion of the jury. In the general field of criminal law the Legislature has abandoned the ancient notion of categorical punishment, the infliction of fixed terms for certain crimes, and substituted the indeterminate sentence, leaving to the Adult Authority the judgment of the period of incarceration.[8] The Authority does not fix that period pursuant to a formula of punishment,[9] but in accordance with the adjustment and

---

[8]As Justice Schauer has pointed out in *People* v. *Friend* (1957) 47 Cal.2d 749, 763 (fn. 7) [306 P.2d 463]: "'... This state has long since accepted the view (as recognized and implemented by the indeterminate sentence laws and other acts) that, generally speaking, punishment should be fitted to the perpetrator of the crime, not merely the crime. ...'" The United States Supreme Court in *Williams* v. *State of New York* (1949) 337 U.S. 241, 247 et seq. [69 S.Ct. 1079, 93 L.Ed. 1337] has recognized the validity of the same principle: "Undoubtedly the New York statutes emphasize a prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime. *People* v. *Johnson*, 252 N.Y. 387, 392 [169 N.E. 619, 621]. The belief no longer prevails that every offense in a like legal category call for an identical punishment without regard to the past life and habits of a particular offender. This whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions—even for offenses today deemed trivial. ... Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence." See *Roberts* v. *Duffy* (1914) 167 Cal. 629, 634 [140 P. 260]; *People* v. *Denne* (1956) 141 Cal.App.2d 499 [297 P.2d 451]; but see Pen. Code, § 209.

[9]Section 5079 of the Penal Code states that the director of corrections shall provide for a psychiatric and diagnostic clinic and that "The work of the clinic shall include a scientific study of each prisoner, his career and life history, the cause of his criminal acts and recommendations for his care, training and employment with a view to his reformation and to the protection of society. ..." Indeed, the early case of *Roberts* v. *Duffy* (1914) 167 Cal. 629, 634 [140 P. 260] explains that the "purpose and object of a parole system is to mitigate the rigor of the old, and while requiring the punishment of a prisoner by actual confinement for a fixed period of his term of sentence, still to provide a more humane management and prison discipline under which there is extended to those who may show a disposition to reform and whose reformation may reasonably be expected, a hope and prospect of liberation from the prison walls under the restrictions and conditions of a parole. It recognizes, that notwithstanding the commission of crime requires a measure of imprisonment as a penalty, still that the interests of society require

social rehabilitation of the individual analyzed as a human composite of intellectual, emotional and genetic factors. Hence the jury, in this whole field of crime, does not determine the penalty; the task of deciding the term of incarceration lies with an expert body. Yet in the instance of capital crime the jury must perform the function of defining punishment, which, in this case, includes the tremendous sanction of the death penalty.

The jury's task assumes formidable proportions because it far transcends the usual function of finding whether or not certain events occurred and certain consequences resulted from them. The jury in this instance performs no such circumscribed task; it must in each particular case, depending wholly on the kind of defendant and nature of facts before it, decide the issue of life or death. In reaching its crucial decision, although Penal Code section 190.1 states it may consider "facts in aggravation or mitigation of the penalty," the jury has no guidelines, no standards, no criteria. The Legislature has reposed in the jury a wide and onerous task, aggravated by this conflict in function and philosophic background. (*People* v. *Hamilton* (1963) *ante*, pp. 105, 136 [32 Cal.Rptr. 4, 383 P.2d 412].)

The objective situation is difficult enough without blurring the functions. The function of the jury is to consider the facts surrounding the crime and defendant's background, and upon that basis, reach its decision. The jury should not be invited to decide if the defendant will be fit for release in the future; it should not at all be involved in the issue of the time, if any, when the defendant should be released; it should not be propelled into weighing the possible consequences of the Authority's administrative action.

The vice of placing such issues before the jury reaches deeper than the promulgation of confusion; it frames questions that no human mind can answer, and it, in substance, transposes the task of the Adult Authority to the jury.

The questions are unanswerable because they rest upon future events which are unpredictable. The jury's attention may be focused, as it was here, upon whether the Authority will release the defendant into society at some uncertain date in the future, such as "eight, nine, ten years from now."

that under prison discipline every effort should be made to produce a reformation of the prisoner, and proper measures adopted so that this may be accomplished. . . ."

Based upon what defendant may then be, the jury is asked whether it thinks defendant should at *that time* be released to society. Premised upon the unknown, the question asks for an answer that cannot be intelligently rendered. The jury is precipitated into a judgment upon the imponderable.

To propose such questions to the jury is to present to it problems that the Legislature has entrusted for solution to the Adult Authority. The Legislature established the Authority as a specialized body, aided by a trained staff, to decide such questions. It reaches its decisions after the prisoner has received treatment at a corrective institution, has been carefully supervised and has been afforded an opportunity to attempt to understand his maladjustment. From years of annotated observation of the defendant the Authority can render an informed prognosis as to his potential. The jury, on the other hand, must plunge into a judgment based upon conjecture; it must attempt to perform a function which the Legislature expressly granted to another institution and impliedly denied to it.

The final and most dangerous error of permitting the jury to consider the Authority's possible grant of parole is to induce it to pass judgment upon the very issue foreclosed to it and to *prevent* the proper body from deciding the issue at the proper time. The jury can conclude that the Authority will improperly grant defendant parole in the future; it may fear that the Adult Authority will permit a ''dangerous'' defendant to walk the streets; it may then foreclose the authority from ever granting parole by imposing the death penalty. The jury would thus improperly preempt the whole parole system and defeat the legislative design. The jury would then utilize the death penalty for fear that the Adult Authority will not properly perform the function that the Legislature has specifically delegated to it.[10]

The vices which we have described above find dramatic illustration in the prosecutor's argument to the jury in the instant case: ''And I frankly believe, based on the evidence that we have heard here, that he is never going to change. Twelve years from now, or seven, eight, nine, ten years from

---

[10]As one writer put it, ''[T]he fact that a person sentenced for life might be released before he may safely be returned to society indicates a weakness in the parole system—not that he ought to have been executed.'' (Knowlton, *Problems of Jury Discretion in Capital Cases* (1953) 101 U.Pa.L.Rev. 1099, 1119.) See *In re Lee* (1918) 177 Cal. 690, 693 [171 P. 959].

now, when he comes up for consideration do you honestly think that he is going to have changed one little bit? Do you honestly feel that if he gets the thought in his mind that he would like to kill somebody that he is going to be any different? ... It is true that when they consider him for parole they are going to consider the fact that he killed two people. No question about that. But that's no guarantee that he is not going to be back on the street in the average time, or even less than the average time. That's what we have got to face. That's the reality.''

We have pointed out that the majority of other jurisdictions hold that the possibility of parole is not a proper matter for the jury's consideration in the instant situation. We turn to an exposition of the reasoning of some of these cases.

The leading case on the subject demonstrates that we would not be the first jurisdiction to reconsider its earlier position on the point. In a learned opinion by Chief Justice Weintraub the New Jersey Supreme Court in *State* v. *White* (1958) 27 N.J. 158 [142 A.2d 65], overruled a body of settled law that had been reaffirmed in numerous cases during an interim of over 40 years. The court in *White* stated that ''upon a re-appraisal of the problem, we cannot escape the conclusion that the course heretofore approved is erroneous.'' (P. 72 [142 A.2d].) On the merits of the issue *White* held that '' [T]he Legislature committed to the jury the responsibility to determine in the first instance whether punishment should be life or death. It charged another agency with the responsibility of deciding how a life sentence shall be executed. The jurors perform their task completely when they decide the matter assigned to them upon the evidence before them. What happens thereafter is no concern of theirs. It is no more proper for a jury to conclude that death be the penalty because a life sentence may be commuted or the defendant paroled, than it would be for a trial judge in other criminal causes deliberately to impose an excessive sentence to frustrate the statutory scheme committing parole to another agency.'' (142 A.2d at p. 76.)

*Broyles* v. *Commonwealth* (Ky. 1954) 267 S.W.2d 73 [47 A.L.R.2d 1252], involved a case in which the jury exercised the duty of fixing the sentence. The prosecutor argued to the jury that a life sentence meant the possibility of parole after eight years, that a 21-year sentence meant the possibility of parole after six years, and that defendant was eligible for parole after the expiration of one-third of any sentence of

less than 10 years. In holding such an argument to be prejudicial error, the Kentucky court stated: "[U]nder our theory of separation of governmental powers, it is the duty of the judiciary to obtain a conviction of those guilty of crime. But once that conviction has been obtained and sentence imposed, it is the duty of other departments of government to enforce the sentence and to determine when and under what circumstances the prisoner will be eligible for release. Therefore, when the judiciary attempts to anticipate the rules of the legislative and executive departments relating to the parole of prisoners and attempts, in effect, to circumvent those rules it infringes upon the prerogatives of other departments of government." (267 S.W.2d at p. 76.)

In *Williams* v. *State* (1950) 191 Tenn. 456 [234 S.W.2d 993], the responsibility of choosing between the death penalty and life imprisonment likewise was reposed in the jury. The Tennessee Supreme Court found prejudicial error in the trial court's discussion of parole laws with the jury; the court emphasized that the jury could not properly inflict the death penalty only because it opposed the defendant's possible parole under a life sentence. (See *Graham* v. *State* (1957) 202 Tenn. 423 [304 S.W.2d 622].)

The appellate court found prejudicial error in *Sukle* v. *People* (1941) 107 Colo. 269 [111 P.2d 233], a case in which the jury, after being instructed that life imprisonment meant possible parole, rendered a death penalty verdict. The court stated that the jury was encouraged "to speculate on what the chief executive of the state, at some future time, acting pursuant to authority of law apart from the law under which the judiciary proceeds, might then conclude justice required at his hands. Prejudicial error is obvious." (P. 235 [111 P.2d].)

In reversing a rape conviction which involved only imprisonment, and not the death penalty, as here, the court in *Lawley* v. *State* (1956) 264 Ala. 283 [87 So.2d 433], stated that "[I]n arriving at a proper sentence to be imposed on a defendant, the proportionate part thereof which probably or possibly might be deducted therefrom by the Parole Board was not a proper factor to be considered by the jury, and it is error for the court to instruct the jury as to the laws or customs governing the granting of paroles. ... It is reasonable to assume that the jury wished to punish the defendant by having him serve a certain number of years in the penitentiary and in order to insure that he serve that length of

time, the jury was planning to add to the length of the sentence in order to compensate for a parole before the entire sentence was served.'' (87 So.2d at pp. 434-435.)

In view of these considerations we turn to the delicate problem of delineating the function of the jury in the penalty phase of the case and determining the kind of instruction that should be given to it. We have stated that enlightened legislation in California has advanced the treatment of criminals from the stage of mechanical punishment, based exclusively upon the crime, to an appraisal of the individual wrongdoer for the purpose of his possible reformation. The emphasis must be upon the individual rather than the offense; such insistence upon the importance of the individual symbolizes a basic value of our society that contrasts with a totalitarian denigration of the individual as an appendage of the state. Our insistence upon the dignity and worth of the individual must surely be strictly and steadfastly applied in the crucial context of the individual's life or death.

The jury decides whether the individual should be permitted to live upon the basis of a complete and careful analysis of that person as a human composite of emotional, psychological and genetic factors. The jury looks at the individual as a whole being and determines if he is fit to live. █ The jury is entitled to weigh psychiatric and other testimony as to his susceptibility to rehabilitation and reformation. It should not, however, attempt to appraise whether at some future date the Adult Authority may improperly release the defendant or speculate as to when he might be released.

█ In evolving a proper instruction for the jury, we recognize that individual jurors often entertain some ideas of parole laws and might erroneously consider the effect of such laws upon a term of life imprisonment. They may ask the trial judge for information upon the subject; it is not enough for the trial court merely to refuse the request and relegate them to ignorance. To avoid such unanswered queries and to prevent latent misconceptions, we believe the trial court, at the time of rendition of all instructions, should inform the jury in general terms that life imprisonment can result in parole but that such matters are of no concern to it.[11]

[11]Many of the jurisdictions that hold it improper for a jury to consider the possibility of parole in deciding punishment do not find error in instructions or arguments relating to parole so long as the trial court specifies that this subject is not a matter for consideration or speculation by the jury. E.g., *Lee* v. *State* (1957) 265 Ala. 623 [93

We set forth the following instruction for the general guidance of the trial court: "A sentence of life imprisonment means that the prisoner may be paroled at some time during his lifetime or that he may spend the remainder of his natural life in prison. An agency known as the Adult Authority is empowered by statute to determine if and when a prisoner is to be paroled, and under the statute no prisoner can be paroled unless the Adult Authority is of the opinion that the prisoner when released will assume a proper place in society and that his release is not contrary to the welfare of society. A prisoner released on parole may remain on parole for the balance of his life and if he violates the terms of the parole he may be returned to prison to serve the life sentence.

"So that you will have no misunderstandings relating to a sentence of life imprisonment, you have been informed as to the general scheme of our parole system. You are now instructed, however, that the matter of parole is not to be considered by you in determining the punishment for this defendant, and you may not speculate as to if, or when, parole would or would not be granted to him. It is not your function to decide now whether this man will be suitable for parole at some future date. So far as you are concerned, you are to decide only whether this man shall suffer the death penalty or whether he shall be permitted to remain alive. If upon consideration of the evidence you believe that life imprisonment is the proper sentence, you must assume that those officials charged with the operation of our parole system will perform their duty in a correct and responsible manner, and that they will not parole this defendant unless he can be safely released into society. It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the Adult Authority will properly carry out its responsibilities."

 In the light of the foregoing discussion we disap-

So.2d 757] ; *State* v. *Conner* (1955) 241 N.C. 468 [85 S.E.2d 584] ; *State* v. *White* (1958) 27 N.J. 158 [142 A.2d 65]; *Liska* v. *State* (1926) 115 Ohio St. 283 [152 N.E. 667]. In *State* v. *White, supra,* the court set forth a proposed model instruction similar to that incorporated in this opinion. Some jurisdictions hold it improper even to mention or discuss the parole laws. *McKuhen* v. *State* (1960) 102 Ga.App. 75 [115 S.E.2d 625]; see *Williams* v. *State* (1950) 191 Tenn. 456 [234 S.W.2d 993]; cf. *People* v. *Burgard* (1941) 377 Ill. 322 [36 N.E.2d 558]; *Davis* v. *State* (1959) 168 Tex. Crim. Rep. 72 [328 S.W.2d 765.] See generally, Comment (1936) 15 Stan.L.Rev. 349; Comment (1953) 10 Wash. & Lee L.Rev. 219.

prove of CALJIC No. 306 (rev.) and the decisions set forth in footnote 2, *supra*, to the extent that they conflict with this opinion.

2. *Instruction as to the trial judge's and Governor's possible reduction of the death penalty.*

 We believe that the instruction that the trial judge has the power to reduce a death penalty to a sentence of life imprisonment may very well induce the jury to assume that its finding for the death penalty merely initiates a series of procedures which invoke a reconsideration of the penalty and which may result in its reduction to life imprisonment.

Since the jury undertakes the task of assessing the penalty in the wide latitude of absolute discretion and in the absence of statutory guide lines, the suggestion that higher authorities will *review* its decision must profoundly affect it. Upon the delicate scale of unbounded determination we add a new but definite weight. The impact of the instruction must necessarily weaken the jury's own sense of responsibility. Yet nothing should be introduced to the jury to detract from its most careful consideration of the choice of penalty. That effort should not be adulterated by the infusion of foreign and deflecting factors.

In previous cases we have condemned the introduction of considerations of less consequence than instructions which have brought to the jury's attention a postsentencing possibility that might diminish its sensitivity to its task. In *People* v. *Linden* (1959) 52 Cal.2d 1 [338 P.2d 397], we found error in the prosecutor's argument that, "in California we have a law that where a death penalty is imposed . . . it goes immediately to the Supreme Court of the State of California. They review your decision if a death penalty is imposed, and they determine from the law whether such a penalty is justified, or if they believe the evidence is such that only a second-degree murder was committed, or they could determine that there was prejudicial error." (52 Cal.2d at p. 26.) In condemning this type of argument, *Linden* stated that "a jury should approach the tasks of finding facts and exercising discretion as to choice of penalty with appreciation that their duties are serious and that they are accountable for their decisions, not with the feeling that they are making mere tentative determinations which the courts can correct. The jury *have no concern with and should not be informed of the automatic appeal where judgment of death is imposed,* and of course they should not be misinformed (as they inferentially

were here) concerning this court's powers. Argument such as that of the deputy district attorney above quoted improperly diminishes the jury's recognition of their duties and responsibilities and powers.'' (52 Cal.2d at pp. 26-27; italics added.)

While *Linden* relied upon two propositions, the second, and more significant, developed the danger of involving the jury in matters with which it had no concern. The court first explained that the argument *misinformed* the jury as to the power of this court. In particular, the contention improperly implied that this court could substitute its judgment as to choice of punishment. Thus *Linden* stated that ''of course they should not be misinformed . . . concerning this court's powers.'' The court's second and more basic point was simply that the automatic appeal in death penalty cases should be *of no concern* to the jury, since to inform it of the possibility of this appeal improperly diminished its own sense of responsibility.

The latter reasoning in *Linden* finds support in *People* v. *Sampsell* (1950) 34 Cal.2d 757 [214 P.2d 813], in which case the prosecutor argued that ''the State of California has what is known as an automatic appeal in a death case, and *it is not entirely your responsibility. Your verdict must be approved in a death case by the Supreme Court of the State of California* . . . to be sure that the Supreme Court is in agreement with your verdict. *So it is not all your responsibility.*'' (34 Cal.2d at p. 762.) Of this argument the court said ''the district attorney's remarks concerning the function of this court where an automatic appeal is taken . . . constitute reprehensible conduct which is not to be condoned.'' (*Id.* at p. 765.)

If *Linden* and *Sampsell* condemn the *argument* which may diminish the jury's sense of responsibility, the *instruction* which works that result is necessarily erroneous. Words of instruction of the trial judge are more likely to effect prejudice than the words of argument of the prosecutor. Moreover, if the jury cannot be told of the automatic appeal which does not enable the Supreme Court to reduce the penalty, it should not be told of a procedure which permits the trial court to change with finality the very decision rendered by the jury.

The recent case of *People* v. *Ashley* (1963) 59 Cal.2d 339, [29 Cal.Rptr. 16, 379 P.2d 496], does not affect the rulings of *Linden* and *Sampsell*. The defendant in *Ashley*, an automatic

appeal case, argued that the present instruction effected error because it misled the jury in failing to add that the court is empowered to reduce the sentence only if defendant moves for a new trial. Although in *Ashley* we noted the technical inadequacy of the instruction, we found that the error could not possibly have misled the jury. The *Ashley* opinion neither cites *Linden* on this point nor passes upon the instant argument that the possibility of the court's reduction of the sentence should not concern the jury because of its tendency to reduce the jury's sense of responsibility. Thus *Ashley* considers only one of the grounds discussed in *Linden*, namely the error in misinforming or misleading the jury as to the actual post-conviction procedures, and does not discuss the second and separate ground relating to the impropriety of a correct instruction as to the automatic appeal. Justice Peters summarizes by stating, ''the jury could not possibly have been misled, by the *technical incompleteness* of the instruction.'' (59 Cal.2d at p. 365; italics added.)

The theoretical considerations which lie behind the prohibition of the introduction of alien matters in the guilt phase of the trial may very well apply to the penalty phase. In the guilt phase the accepted rules forbid the jury from resolving doubts in favor of conviction upon the hypothesis that an appeal can cure the possible error or that the defendant may obtain parole or a pardon. Indeed, the clear weight of authority holds that the jury should not reach a compromise of the issue of guilt and find a conviction because appeal may cure this error,[12] or because the Governor may grant a pardon,[13] or because a defendant may obtain a light sentence or parole.[14] California decisions accord with this view.[15]

Some cases extend this philosophy to the function of the

[12]*United States* v. *Fiorito* (7th Cir. 1962) 300 F.2d 424; *Blackwell* v. *State* (1918) 76 Fla. 124 [79 So. 731, 1 A.L.R. 502]; *Kelly* v. *State* (1936) 210 Ind. 380 [3 N.E.2d 65] ; *State* v. *Kring* (1877) 64 Mo. 591 ; *State* v. *Biggerstaff* (1896) 17 Mont. 510 [43 P. 709]; *People* v. *Johnson* (1940) 284 N.Y. 182 [30 N.E.2d 465, 132 A.L.R. 675]; *State* v. *Clark* (1961) 227 Ore. 391 [362 P.2d 335]; *Gray* v. *State* (1950) 191 Tenn. 526 [235 S.W.2d 20]; *Crow* v. *State* (1894) 33 Tex.Crim.Rep. 264 [26 S.W. 209].

[13]*Commonwealth* v. *Mills* (1944) 350 Pa. 476 [39 A.2d 572].

[14]*People* v. *Sukdol* (1926) 322 Ill. 540 [153 N.E. 727]; *Pollard* v. *State* (1929) 201 Ind. 180 [166 N.E. 654]; *State* v. *Tennant* (1927) 204 Iowa 130 [214 N.W. 708]; *Shoemaker* v. *State* (1961) 228 Md. 462 [180 A.2d 682]; cf. *People* v. *Sherwood* (1936) 271 N.Y. 427 [3 N.E.2d 581].

[15]E.g., *People* v. *Riser* (1956) 47 Cal.2d 566 [305 P.2d 1].

jury in general, including the imposition of sentence, and broadly forbid the presentation of matters that may weaken the juror's sense of responsibility.[16] Thus, on the specific point of imposing the death penalty, the Supreme Court of New Jersey in *State* v. *Mount* (1959) 30 N. J. 195 [152 A.2d 343], held that the court improperly instructed the jury that its choice of the death penalty was not necessarily conclusive. The court stated that "when the trial court interrupted to stress that the jury's omission of a recommendation would not necessarily mean death to the defendant because 'we have appeal courts and everything else, so a lot of things could happen,' ... it tended to dilute the jury's crucial sense of responsibility." (152 A.2d at p. 351.) The North Carolina Supreme Court in *State* v. *Little* (1947) 228 N. C. 417 [45 S.E.2d 542], found prejudicial error in the prosecutor's argument that even if the defendant were sentenced to death there would be a 40 percent chance that his sentence would be commuted to life. (See *State* v. *Hawley* (1948) 229 N. C. 167 [48 S.E.2d 35].)

Concluding for the foregoing reasons that the instruction improperly called to the jury's attention the judge's power to reduce the death sentence to life imprisonment, we note that the instruction additionally stated that the jury could also consider the possibility that the Governor could so reduce the sentence. The vice of the latter instruction parallels that of the former. Both statements tend to diminish the jury's sense of obligation; they both infuse into the issue factors that do not belong there. To the extent that previous cases permit instruction or argument that the court or Governor may reduce a death sentence to life imprisonment, they erroneously permit the importation of extraneous matter to the jury rooms; they should accordingly be disapproved.[17]

We have no doubt that these errors in directing the attention of the jury to the roles of Adult Authority, judge and Governor, by means of argument, evidence and instruction in the instant case, prejudicially influenced the jury. Moreover, after deliberating for one day, the jury specifically asked "to hear again the court's instructions re the third phase, in

---

[16]*State* v. *Mount* (1959) 30 N.J. 195 [152 A.2d 343] ; *People* v. *Johnson* (1940) 284 N.Y. 182 [30 N.E.2d 465, 132 A.L.R. 675] ; *State* v. *Little* (1947) 228 N.C. 417 [45 S.E.2d 542]; *Gray* v. *State* (1950) 191 Tenn. 526 [235 S.W.2d 20] ; see *United States* v. *Fiorito* (7th Cir. 1962) 300 F.2d 424.

[17] See fn. 5, *supra*.

clarification of reference to possible consequences.'' The court then reread the above-mentioned instruction. The jury then asked additional questions relating to the alternative death or life sentences. Thus the jury, while deliberating upon the death penalty, was aware of, and had repeated to it, the facts concerning the roles of the Adult Authority, the trial judge and the Governor. Furthermore, the trial court affirmatively instructed the jury that it could consider these facts. Whatever the reasons this court might have found in the record in *Linden* ''to avoid an otherwise indicated reversal,'' we find in the record here no justification for concluding that the error was not prejudicial insofar as concerns the fixing of penalty. To the contrary, after examination of the entire cause, including the evidence, we are of the opinion that it is reasonably probable that a result more favorable to defendant as to penalty would have been reached in the absence of the error.

 In view of the prior decisions as to the subject matter of the instruction, defendant's failure to object to it should not foreclose his opportunity to present these issues on appeal. Such an objection at the trial level under the existing rulings would have been useless and unavailing.

 In conclusion, we believe that the instructions as to the judge's and Governor's possible reduction of the death penalty tend to mislead the jury into assuming that the rendition of the penalty initiates a chain of proceedings by the court and the Governor which will achieve a reweighing of the sentence and possibly produce its nullification. The instructions and evidence of the Adult Authority's possible grant of parole invite speculative argument to the jury and surmise by it of the possible improper release of a defendant to society in the future; yet that matter does not truly lie in its province but in the expert judgment of the Adult Authority. In sum, the instructions foster the dual vices of foisting upon the jury alien issues and concomitantly diluting its own sense of responsibility.

Our rule is a minority one which we have only lately adopted. One jurisdiction has reversed its former approval of these instructions even though they had been given for a longer period than here. These erroneous instructions should be uprooted from our law before they become a verbal jungle of error; planted in the jurors' minds, they bear their own fruit of confusion.

B. *Alleged errors in the guilt trial.*

1. *Prosecutor's charge of false testimony.*

■ The court did not err in overruling a defense objection to the prosecutor's charge in oral argument that defendant testified falsely. In view of defendant's conflicting statements, the prosecutor drew a legitimate inference from the evidence that defendant falsely stated that during the weekend of the crimes he had used dangerous drugs. Such inferences, limited to the evidence adduced at trial, constitute proper argument. (*People* v. *Terry* (1962) 57 Cal.2d 538, 562 [21 Cal.Rptr. 185, 370 P.2d 985]; *People* v. *Lopez* (1913) 21 Cal.App. 188, 191 [131 P. 104]; *People* v. *Glaze* (1903) 139 Cal. 154, 159-160 [72 P. 965].)

The prosecutor emphasized that defendant had told the police that he had not been under the influence of drugs or narcotics. At that time defendant volunteered ''If I thought it would do me any good in court I would tell you I was really strung out.'' Subsequently defendant testified that on the Saturday afternoon immediately preceding the crimes he had obtained a quantity of dangerous drugs in Tijuana, had taken an excessive dosage, and would not have committed the crimes if he had not been under the influence of the drugs. Yet Jack Drummond, his companion on the Saturday in question, testified that he and defendant had been together most of the day; such testimony practically nullified defendant's opportunity to leave the country to purchase the drugs. The only testimony in support of defendant's contention that he had obtained and consumed drugs that Saturday was that of a fellow tankmate, facing trial for a felony narcotics violation, who maintained that he and defendant had been in Tijuana. The prosecution, however, seriously impeached that testimony. Under the circumstances, the prosecution merely emphasized one reasonable interpretation of the evidence.

2. *Instruction as to intoxication.*

■ The court refused to give defendant's requested instruction based upon *People* v. *Gorshen* (1959) 51 Cal.2d 716, 727 [336 P.2d 492]. The instruction read as follows: ''You are further instructed that *expert evidence of unconsciousness* resulting from voluntary intoxication is received, not as a 'complete defense' negating capacity to commit any crime, but as a 'partial defense' negating specific mental state essential to a particular crime.'' (Italics added.) The court, however, instructed the jury that: ''Specific intent to kill is not a necessary element of second degree murder, but is a

necessary element of the kind of first degree murder described as willful, deliberate and premeditated killing.''

Without passing on the merits of the requested instruction, we believe that the complete answer to defendant's contention lies in his failure to adduce expert evidence of unconsciousness resulting from voluntary intoxication. In fact, the opinion of the expert witness, as implemented by the testimony of defendant's acquaintances who observed his relevant behavior, defeated any possible inference of defendant's voluntary intoxication to the point of unconsciousness. Several witnesses testified that defendant's behavior in their presence during the weekend in question appeared normal.

Dr. Lentz, who later testified as an expert witness for the defense, had, as a court-appointed psychiatrist, submitted to the court a report indicating that defendant's asserted intoxication from drugs during the weekend ''although not exculpatory, might be considered mitigating.'' At the trial, however, he stated that the benzedrine and barbiturate drugs which defendant claimed to have taken would be incapable of producing toxic psychosis and that unless defendant had reached a degree of drug intoxication readily apparent to lay observers he would remain capable of calculated judgment. ''People on the street would be able to say, well, there was something odd about this reaction. ... This state, or this severity ... would surely show to anybody.'' Dr. Lentz further testified that in his opinion defendant, at the time of the perpetration of the crimes, possessed the ability to premeditate and deliberate.

3. *Instructions as to murder by means of lying in wait.*

Although defendant contends that the evidence did not justify the court in instructing the jury that ''All murder which is perpetrated by means of lying in wait is murder in the first degree,'' ample evidence supports this instruction; defendant confessed to conduct which justifies it.

The jury in its discretion could reject defendant's version of the criminal episode as described at the trial and accept, instead, his earlier tape-recorded statements to the police. Officer Morrison verified the transcript of the tape-recorded statements as required for its introduction. (*People* v. *Wojahn* (1959) 169 Cal.App.2d 135, 146 [337 P.2d 192]; *People* v. *Wootan* (1961) 195 Cal.App.2d 481 [15 Cal.Rptr. 833].) The tape recording and transcript were admissible evidence. (*People* v. *Stephens* (1953) 117 Cal.App.2d 653, 660 [256 P.2d 1033]; *People* v. *Wojahn, supra,* p. 146.) The transcript

implemented the tape recording in those instances where the tape was unclear; this court has approved the above procedure in previous decisions. (*People* v. *Ketchel* (1963) 59 Cal. 2d 503, 519 [30 Cal.Rptr. 538, 381 P.2d 394]; see also *People* v. *Dupree* (1957) 156 Cal.App.2d 60, 68 [319 P.2d 39]; *People* v. *Albert* (1960) 182 Cal.App.2d 729, 742 [6 Cal.Rptr. 473].)

Defendant, in his tape-recorded confession, stated that he picked up the rock in his front yard early Sunday morning with the intent to kill someone. After his mother let him into the house and they had each retired to their respective sleeping quarters, defendant called to her, perhaps saying "Hey, come here for a second." He waited in the dark of the bedroom corridor until she arose and opened her bedroom door; then he struck her.

The instruction concerning murder by lying in wait appropriately stemmed from these events; the record affords evidence of defendant's intention to kill and of his perpetration of his mother's murder by means of lying in wait for the opportune moment to strike. (See *People* v. *Sutic* (1953) 41 Cal.2d 483, 492-493 [261 P.2d 241]; *People* v. *Byrd* (1954) 42 Cal.2d 200, 208-209 [266 P.2d 505]; *People* v. *Tuthill* (1947) 31 Cal.2d 92, 99-101 [187 P.2d 16].)

4. *Instruction as to reasonable doubt as related to the degree of the murder.*

 Because defendant addressed his argument principally to the question of first or second degree murder, he maintains that the court should have specifically pointed the instructions concerning reasonable doubt and circumstantial evidence to the issue of degree. Defendant did not submit instructions in this regard but nevertheless contends that "By giving the circumstantial evidence instruction, said instruction discussed the fact of the defendant's *right to acquittal*. Since this was not properly before the jury, it is the defendant's contention that the instructions should have been made more understandable by relating them to the question of first or second degree." (Italics added.)

 Although in criminal cases the court must instruct the jury on its own motion as to applicable general legal principles, even though the parties fail to propose such instructions, the court need not render particular instructions as to specific points unless the parties request them or they are essential to a fair trial. (See *People* v. *Jackson* (1963) 59 Cal.2d 375, 379-380 [29 Cal.Rptr. 505, 379 P.2d 937]; *People*

v. *Warren* (1940) 16 Cal.2d 103, 116-117 [104 P.2d 1024].)

 Defendant's plea of not guilty remained before the court; all matter in controversy under that plea continued as live issues before the jury. Likewise, instructions which embraced defendant's "right to acquittal" properly remained before the jury. Neither the court nor defense counsel could withdraw from the jury's consideration the question of defendant's innocence without his personal consent. (*People* v. *Rogers* (1961) 56 Cal.2d 301 [14 Cal.Rptr. 660, 363 P.2d 892].)

The general instructions as to circumstantial evidence and reasonable doubt were, moreover, implemented by the following instruction as to the degree of the crime: "When, upon the trial of a charge of murder, the jury is convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but has a reasonable doubt whether such murder was of the first or second degree, the jury must give to such defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." The court thus apprised the jury that it should consider not merely the issue of first degree murder or acquittal but that, in determining the degree of the crime, it should give defendant the benefit of any doubt. We cannot, therefore, conclude that defendant suffered prejudice in the court's instructions.

The judgment is reversed insofar as it relates to the penalty. In all other respects the judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., and Peek, J., concurred.

McCOMB, J., Concurring and Dissenting.—I would affirm the judgment in its entirety, to wit: (a) finding the defendant guilty of murder in the first degree and (b) fixing the penalty at death.