Filed 4/8/15  P. v. Barrios CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE BARRIOS,<br><br>    Defendant and Appellant. | B255151<br><br>(Los Angeles County Super. Ct.<br> No. VA130170) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick T. Meyers, Judge.  Affirmed.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi, Deputy Attorney General, and Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury found defendant and appellant Jose Barrios guilty of the first degree murder of Robert Guerrero.  (Pen. Code, § 187, subd. (a).)  It found true the allegations that defendant personally discharged a firearm causing great bodily injury and death.  (Pen. Code, § 12022.53, subd. (d).)  The trial court sentenced defendant to 50-years-to-life in prison, comprised of a term of 25-years-to-life for the murder conviction and 25-years-to-life for the firearm enhancement.

Defendant contends that the trial court abused its discretion by admitting irrelevant and prejudicial evidence of possession of firearms not used in the murder, drug use, and character evidence unrelated to the crime, in violation of Evidence Code 352,[1] and his federal constitutional right to due process.  He further contends that trial counsel rendered ineffective assistance to the extent that counsel failed to object to the admission of this evidence, and that the cumulative errors prejudiced defendant.

We affirm the judgment.

**FACTS**

*Events Prior to Guerrero's Murder*

Jessica Garcia and defendant began dating in June 2011.  Defendant was jealous and possessive of Garcia.  In August 2011, Garcia told defendant that she was pregnant with his child.  Defendant became very angry and did not believe the child was his.  The couple argued; defendant pulled out a gun and held it to Garcia's head.  He said he would kill her if she did not abort the pregnancy.

---

[1] All further statutory references are to the Evidence Code, unless otherwise stated.

2

On October 22, 2011, Guerrero, who was defendant's friend, sent Garcia several text messages. Defendant had introduced Garcia to Guerrero, and she saw him a few times when Guerrero helped defendant move. Guerrero wrote in one text, "Hey send me a pick 4 me only of ur-self . . . Only for me." Another text read, "Yeah I think ur sweet heart between us I'll never say nothen it's only between us send me a hot pick of you." In another text, Garcia wrote, "You're kool I like you keep our friend ship between us." Garcia told defendant about the texts.

Sometime after February 2012, Garcia obtained a restraining order against defendant and ended their relationship. Their daughter was born on April 26, 2012. Garcia did not tell defendant where she was giving birth and did not want him present. Defendant came to the hospital unannounced. He started crying, and said, "Why didn't you tell me you had my baby." He took Garcia's cell phone and went through her text messages. Defendant found the texts from Guerrero and became very angry. Defendant screamed at Garcia about the texts and said he was going to "murder that motherfucker." Defendant called several people on Garcia's cell phone, stating he was going to "kick their ass for talking to his girl."

Garcia suffered from postpartum depression after giving birth. In May 2012, the Department of Social Services took her daughter. Garcia's mental condition required institutionalization. Garcia was under the care of a psychiatrist at the time of the trial. She blamed defendant in part for losing custody of her daughter. Garcia went to court several times regarding her daughter. Defendant also attended the court hearings, dressing in a suit and tie.

Benjamin Rodriguez lived about four houses down the street from where defendant and Garcia had lived together. He had known Garcia since high school and saw defendant almost every day. Sometime in 2012, defendant told Rodriguez he did not get along with Guerrero because Guerrero disrespected him in front of his daughter and his mother. Defendant told Rodriguez that he warned Guerrero, "Don't let me catch you slippin' in the 'hood." Defendant also told Rodriguez he had threatened a man with a shotgun after the man "mess[ed] around with his baby's mom."

3

*The Murder*

Guerrero was living with his girlfriend, Leticia Reyes, on February 1, 2013. At around 4:30 p.m., Reyes asked Guerrero to go to Stater Bros. Market to pick up groceries for dinner. Guerrero drove to the store in his turquoise Toyota Tacoma.

Defendant also went to Stater Bros. Market at around 4:00 p.m. or 4:30 p.m. that day. He went to buy candy for his girlfriend, Caryna Villalon. Defendant had attended a court hearing relating to his daughter that day, and was wearing a suit and tie.

Surveillance footage from the Stater Bros. Market showed Guerrero's truck entering the parking lot at 4:28 p.m.[2] Guerrero went into the market alone at 4:35 p.m., and immediately withdrew cash from an ATM inside. Defendant entered the market at 4:48 p.m., and went straight over to Guerrero, who was in the checkout line paying for his purchases. Defendant put his arm around Guerrero, and initiated a "fist bump." Defendant continued to stand beside Guerrero as he paid for his groceries. When Guerrero finished checking out, defendant began to walk toward the exit closest to the counter. Guerrero followed him for a few steps and then turned around and walked toward another exit at the other end of the market. Defendant followed, walking slightly behind Guerrero. The two men walked into the parking lot together at 4:49 p.m. The surveillance video did not show defendant making purchases or carrying a bag out of the market. An outside camera showed Guerrero opening the passenger door of his truck for another man at 4:50 p.m. The man appeared to be defendant, although the footage did not show his face. The man was wearing a suit and was defendant's height and build. The man got into the vehicle, and Guerrero closed the passenger door behind him. Guerrero then went to the other side of the truck and got into the driver's seat. At 4:51 p.m., Guerrero and the man left the parking lot in the truck.

---

[2] The surveillance video was played for the jury.

Marlene Contreras lived about a mile from Stater Bros. Market. Her dogs began barking at about 4:54 p.m. She looked out her window and saw a blue truck slow down and park on the street outside. As she walked away from the window, Contreras heard three gunshots followed by the screeching of tires. When she looked outside again, the truck was no longer there, and a man was lying on the ground. Contreras called 911.[3]

At about 4:55 p.m., Maximina Dominguez was walking her dog when she saw Guerrero's blue truck, which was parked next to the sidewalk facing her. Dominguez saw two men talking inside the truck. She then heard gunshots, and the man in the passenger seat pushed Guerrero out of the truck. The man moved over to the driver's seat and began to drive away. He drove about for about six feet and then stopped and stared at Dominguez. She was afraid he would shoot her, too. Dominguez got a good look at the shooter, as he looked right at her and she focused on his face. The man then drove away.

Guerrero was lying in the middle of the street face down. He had suffered three gunshot wounds—one to the head, one to the abdomen, and one to his hand. He was pronounced dead at 5:08 p.m.

Frank Nastasi lived about three quarters of a mile from Stater Bros. Market. At about 5:00 p.m., Nastasi heard the sound of tires screeching outside his house. He looked out and saw a Toyota pickup parked across the street. A man got out of the driver's side door and slammed it shut. The man seemed very angry. He appeared to be a light skinned Hispanic, approximately 5'10" tall, 180 pounds, and between 25 and 30 years of age.[4] The man's hair was black and slicked back. Nastasi looked at the man for about five seconds before the man jumped over a four-foot high fence. Defendant lived two blocks away from the fence at the time.

---

[3] The 911 call was played for the jury.

[4] Defendant is a male Hispanic with dark hair, light skin, and approximately six feet in height. At the time Guerrero was killed, defendant was 21 years old. At the time of defendant's arrest on May 15, 2013, he weighed approximately 170 pounds.

*The Investigation*

After Whittier Police Detective Chad Hoeppner and forensic specialist Chris Kraft arrived at the crime scene, they recovered $300 in $20 denominations, a Bank of America ATM receipt from Stater Bros. Market, and an ATM card. The police went to Stater Bros. Market and obtained the surveillance video for the time beginning at 4:30 p.m. that day.

Whittier Police Officer Esteban Medina located Guerrero's truck. He noticed that the front windows were not tinted, and the driver's side window was rolled down. (3RT 1257-1258.) He approached the truck and saw blood in the center console, steering wheel, and driver's seat. Police discovered a .45 caliber shell casing on the dashboard, and another in the back seat. There were two .45 caliber shell casings and a live .45 caliber round found on the front passenger floorboard area during a subsequent search. Police lifted several fingerprints from the truck and took swabs for DNA analysis. Neither the fingerprints nor the DNA sample matched defendant. All results either matched Guerrero or were inconclusive.

A week after the murder, police showed Dominguez a photo six-pack that included defendant. Dominguez said defendant looked like the man in the truck, but the man in the truck had a rounder face. She could not identify the person in the truck from the six-pack.

Police searched Villalon's house on May 15, 2013. They seized two suits, which both tested negative for blood. Police also found a gun holster, a 9mm magazine clip containing six live 9mm bullets, an empty box of Magtech ammunition, and body armor in receptacles at the rear of the residence.

Also on May 15, 2013, police stopped defendant while he was driving a red Acura Integra. They searched the car and found a box of .45 caliber ammunition and a Ruger .22 handgun.

6

Detective Hoeppner interviewed Reyes and Garcia on May 15, 2013. Reyes mentioned defendant in the interview. Garcia provided Detective Hoeppner a photo of defendant wearing body armor and a gun consistent with a .45 caliber handgun. She gave the police her cell phone, which still contained the October 22, 2011 text messages from Guerrero.

*Trial*

### Prosecution

Dominguez identified defendant in court as the shooter. She explained that she had not initially identified defendant because she feared retaliation.

Garcia and Reyes viewed the surveillance video from Stater Bros. Market and identified Guerrero and defendant in the video. Nastasi testified that defendant "look[ed] like" the man he saw, and that "[h]e could be him."

Rodriguez testified that he jokingly asked defendant whether he "smoked" Guerrero. Defendant told him not to say that. Rodriguez said he knew someone else had killed Guerrero.

Villalon viewed the surveillance video from Stater Bros. Market, and identified defendant entering and exiting the store. She said that defendant returned from the market with a bag of M&Ms and other chocolates. He went to her grandmother's house with her at around 5:00 p.m.

### Defense

Edward Acosta, a private investigator, testified on behalf of the defense. He interviewed Nastasi, who remembered the man he saw wearing casual clothing, not a suit and tie.

## DISCUSSION

### *Standard of Review and Applicable Law*

All of defendant's contentions concern the admission of evidence that he claims was more prejudicial than probative. Pursuant to section 352, the trial court has the discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court has broad discretion to determine both the relevance of evidence and whether its prejudicial effect outweighs its probative value. (*People v. Jones* (2011) 51 Cal.4th 346, 373.) "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error. [Citations.]" (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).)

### **Evidence of Other Firearms Used in Prior Uncharged Acts**

Garcia testified at trial that defendant held a gun to her head when she was pregnant because he questioned whether the baby was his. She also testified that defendant shot her with a BB gun on another occasion. Rodriguez testified that on one

occasion he was afraid of defendant because he believed that defendant had a gun, and that he heard defendant had brought guns to school. Defendant told Rodriguez he used a shotgun to threaten a man who was "messing around with [defendant's] baby's mom." Defense counsel did not object to this testimony from Garcia or Rodriguez. On appeal, defendant contends that it would have been futile to object to the testimony because the trial court had overruled all of the defense's objections relating to other firearms evidence. Alternatively, he claims that counsel was ineffective for failing to object at trial, and that the firearms evidence was inadmissible because it was irrelevant and prejudicial.

We reject defendant's argument that it would have been futile to object because the trial court had overruled other objections relating to firearms. As we discuss below, those objections were to the relevance of defendant's possession of firearms evidence. The testimony in question here related to specific instances of conduct with firearms and a BB gun. Defendant could have objected on the ground that Garcia and Rodriguez's testimony was inadmissible because it concerned prior uncharged acts or character evidence. It would not be futile to object on a different ground, as it would both provide another perspective from which the trial court could view the admissibility of the evidence, and preserve the issue for appellate review. Absent futility, defendant's failure to make a specific and timely objection as to those issues forfeits his arguments on appeal. (*Partida*, *supra*, 37 Cal.4th at pp. 433-434.) We therefore turn to defendant's contention that the failure to object demonstrates ineffective assistance of counsel.

"To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-694 (*Strickland*); *Williams v. Taylor* (2000) 529 U.S. 362, 391-

9

394; *People v. Kraft* (2000) 23 Cal.4th 978, 1068.) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' ([*Strickland*, *supra*, at p. 694]; *People v. Riel* (2000) 22 Cal.4th 1153, 1175.)" (*Cunningham*, *supra*, at p. 1003.) The Supreme Court has held that "[t]he performance component [of the analysis] need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' (*Strickland*[, *supra*,] 466 U.S. at p. 697.)" (*Smith v. Robbins* (2000) 528 U.S. 259, 286, fn. 14.)

"'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)" (*People v. Gray* (2005) 37 Cal.4th 168, 207.)

Here, the record is silent regarding the reason for counsel's failure to object. Accordingly, the issue is more appropriately raised in a petition for writ of habeas corpus. Counsel may have concluded that an objection would have been without merit on the basis that a defendant's possession of a weapon is admissible when it is probative on issues other than the defendant's propensity to possess weapons. (See, e.g., *People v. Jablonski* (2006) 37 Cal.4th 774, 821-823; *People v. Cox* (2003) 30 Cal.4th 916, 956, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Smith* (2003) 30 Cal.4th 581, 613-614; *People v. Gunder* (2007) 151 Cal.App.4th 412, 416, called into doubt on another point in *People v. Moore* (2011) 51 Cal.4th 386, 410-412.)

Section 1101, subdivision (b), permits the admission of evidence of uncharged misconduct when it is "relevant to establish some fact other than the person's character or disposition," such as motive or intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) Garcia's testimony about the incident in which defendant threatened her with a gun

10

tended to establish defendant's jealously, which relates to his motive and intent to kill Guerrero. The same can be said for Garcia's description of the incident with the BB gun and Rodriguez's testimony regarding defendant's statement that he used a weapon to threaten someone who was "messing around with [defendant's] baby's mom."

In any event, defendant cannot satisfy the second prong of ineffective assistance of counsel, because introduction of the evidence in question does not amount to prejudicial error. Evidence was presented that defendant had multiple motives to kill Guerrero—he was intensely angered by Guerrero's advances to Garcia and he was upset that Guerrero had disrespected him in front of his family. Defendant told Garcia that he would kill Guerrero, and told Rodriguez that he warned Guerrero not to let defendant catch him "slipping." Three witnesses, including Villalon—defendant's alibi witness and girlfriend—identified defendant as being the man in the surveillance video from Stater Bros. Market with Guerrero. The video showed that defendant made no purchases at the market and stayed with Guerrero the entire time. The jury could reasonably find that defendant's alibi that he went to the market for the purpose of buying candy for his girlfriend, and that he, in fact, purchased candy and returned home right afterwards, was contrived. The video shows that defendant was the last person with Guerrero before his death, and that he was in Guerrero's truck with him just before Guerrero died. Guerrero was killed a short distance from the market minutes later. Contreras saw a blue truck slow down and park on the street outside her house. She heard three gunshots followed by the screeching of tires. When Contreras looked outside, the truck was gone, and a man was lying on the ground. Dominguez saw defendant argue with Guerrero in Guerrero's truck. She heard gunshots, and saw defendant push Guerrero's body out of the driver's side of the truck. She got a very good look at defendant when he stopped the truck about six feet away from her, and was able to positively identify him at trial. Nastasi saw a man who "looked like" defendant get out of Guerrero's truck, angrily slam the door, and then jump over a fence that was only two blocks from defendant's house. Bullets discovered in defendant's car were of the same caliber as the bullets and casings

11

recovered from Guerrero's truck, and a photo of defendant pictured him with a firearm consistent with a .45 caliber gun.

In light of these facts, admission of Garcia and Rodriguez's testimony was harmless under both the state and federal constitutional standards. Because defendant suffered no prejudice, his ineffective assistance of counsel claim necessarily fails as well. (*Strickland*, *supra*, 466 U.S. at pp. 687-688, 691-692.)


**Firearms Evidence Seized from Defendant's Residence and Car**


The defense filed a pretrial motion in limine pursuant to sections 350 and 352 seeking to exclude evidence of the gun holster, 9mm magazine clip containing live 9mm bullets, the empty box of Magtech ammunition, and body armor found in defendant's residence, and the Ruger .22 handgun found in his car. The prosecution argued that the firearms evidence should be admitted because it was relevant to show that defendant had access to firearms. The defense countered that where use of a specific firearm is alleged, evidence of other firearms not used in the crime is not admissible. The trial court allowed the firearms evidence to be admitted on the basis that it was uncertain whether the .45 caliber bullets and casings recovered at the scene could be fired from one of the other weapons that were seized. The evidence of other firearms was admitted. The prosecution offered no evidence that a .45 caliber bullet could be fired from one of the other firearms that was seized.

All bullets and casings recovered from the scene were .45 caliber. In the absence of expert witness testimony that the .45 caliber bullets could be fired from any of the other guns that were seized, we cannot conclude that the evidence presented directly linked the seized firearms evidence to the murder, and could be admitted on the basis that one of those firearms could have fired the bullets that killed Guerrero. (§ 403, subd. (a)(1) [When "[t]he relevance of . . . proffered evidence depends on the existence of [a] preliminary fact," the "proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is

12

inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact"].)

However, we may affirm "on any basis supported by the record even if not expressly relied upon by the trial court." (*CUNA Mutual Life Ins. Co. v. Los Angeles County Metropolitan Transportation Authority* (2003) 108 Cal.App.4th 382, 397.) The firearms evidence was relevant to other issues related to the murder, including Garcia and Villalon's credibility. (See *People v. Stern* (2003) 111 Cal.App.4th 283, 296 [evidence of uncharged crimes is admissible for purpose of determining credibility of a witness].) Garcia testified to an instance of jealousy and violence when defendant learned she was pregnant and suspected that the baby was not his, in which he threatened her with a gun. As we discussed, defendant's prior act is admissible to show motive. There were possible issues with Garcia's credibility because she had suffered from psychological problems, and blamed defendant, in part, for losing custody of her daughter. Evidence that defendant had firearms corroborated Garcia's story, bolstering her credibility. Villalon, who was defendant's only alibi witness, testified that she had never seen defendant with a gun. The fact that the firearms evidence at issue was confiscated from defendant's car and the residence where they both lived undermined Villalon's credibility and defendant's alibi. It was not an abuse of discretion for the trial court to admit the evidence.

Regardless, in the context of this case the evidence of defendant's possession of other weapons or ammunition had no likelihood of provoking the type of emotional response by jurors that invokes section 352. The jury was aware that a box of .45 caliber ammunition—the same caliber as the casings and live round found in Guerrero's truck—was found in defendant's car, and that defendant had given Garcia a photo of himself holding a gun consistent with a .45 caliber firearm. This evidence was more than sufficient to alert the jury to defendant's possession of firearms. (See *People v. Riser* (1956) 47 Cal.2d 566, 577-578 [no prejudice in admitting evidence of other firearm and ammunition possessed by defendant when jury would have concluded from other, properly admitted evidence that defendant possessed firearms], overruled on other

13

grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648-649.) Finally, as we discussed above, the evidence of defendant's guilt is overwhelming in this case.

**Evidence of Drug Use**

During direct examination of Rodriguez, the prosecution asked whether he ever saw defendant use methamphetamine. Defense counsel objected on the basis that it was irrelevant and prejudicial character evidence. The court held a sidebar discussion, and asked the prosecutor for the relevance of the drug testimony. The prosecutor responded, "[I]t's my understanding through this witness that [defendant] was using methamphetamine almost every day, which would—it could explain his actions on this particular day, and so that's why I'm eliciting this testimony or seeking to elicit this testimony." The trial court overruled defense counsel's objection, stating, "I've weighed it. It's out there. I do not disagree, but I think the affects [*sic*] of meth are increasingly, if not entirely, understood, and I'll permit the inquiry. [¶] I've weighed the probative value against the prejudicial impact. I do not intent [*sic*] to spend a lot of time on drugs on a case that doesn't have drug allegations." The prosecutor elicited testimony from Rodriguez that defendant smoked "weed" and was high on methamphetamine almost every day. He asked Rodriguez: "And how would he act when he smoked methamphetamine?" Rodriguez responded, "Honestly, not too different than—it wasn't very much of a change in his personality or anything like that."

Evidence of a defendant's prior drug use is inadmissible where it "'tends only remotely or to an insignificant degree to prove a material fact in the case . . . .' [Citation.]" (*People v. Cardenas* (1982) 31 Cal.3d 897, 906.) "[T]he cases which have upheld admission of evidence of an accused's drug addiction involved crimes where obtaining narcotics was the direct object of the crime or where a violation of Health and Safety Code was charged." (*People v. Holt* (1984) 37 Cal.3d 436, 450.)

Here, no evidence was presented that obtaining narcotics was the direct object of the crime, and no violation of the Health and Safety Code was charged. There was no

14

evidence tending to show that methamphetamine use causes violent tendencies generally, or that defendant became violent when he used drugs. No evidence was presented that defendant used drugs on the day of the murder. The effect of defendant's possible use of drugs on his state of mind was speculative, and it was error to admit it.

The admission of the drug testimony was unlikely to have had a significant impact on the jury, however. The testimony regarding defendant's drug use was very brief, and Rodriguez specifically testified that when defendant used drugs it had no measurable effect on his personality and actions. As we have already discussed, the evidence of defendant's guilt was vast. Under the circumstances, the admission of Rodriguez's testimony regarding defendant's drug use did not render the trial "fundamentally unfair," and it is not "reasonably probable the verdict would have been more favorable to the defendant" in its absence. (*Partida*, *supra*, 37 Cal.4th at p. 439.)

### Jail Communications

Defendant made several calls to a person called "Eggman" while he was incarcerated. He asked Eggman if he still had "those two things." Eggman responded that he had gotten rid of them. Defendant asked, "Where's the cash at? Why the fuck would you get rid of them fool?" Eggman replied, "Fuck you. You sold my you gave fucking Jigga my twenty-five."

Defendant also called someone named Moody. He asked Moody to "call fucking Eggman fool, and tell fool to drop down to his knees dog and he better pray that I don't fucking get out of here dog because I'm a treat that fool like the enemy fool when I do."

The prosecutor sought admission of the calls to Eggman and Moody on the theory that they were discussing the disposal of guns. He asserted that the "twenty-five" mentioned was a reference to a .25 caliber gun. Defense counsel objected on the grounds that the evidence was irrelevant, prejudicial, and cumulative. The prosecutor reiterated his argument, stating that because the murder weapon was never found in this case, the

15

calls could explain what happened to it. The court stated that the argument was "a big stretch," but admitted the calls.

The calls arguably have some relevance to establish defendant's willingness to suppress evidence, which supports an inference of a consciousness of guilt. The calls also showed defendant's anger and willingness to threaten violence, as he had exhibited in connection with Guerrero. The potential for prejudice flowing from admission of the calls, however, is minimal. The record contains ample evidence, properly admitted, of defendant's angry and threatening conduct. Defendant became enraged and threatened to kill Garcia while holding a gun to her head when she was pregnant. He displayed anger at Guerrero both for disrespecting him in front of family and for sending amorous texts to Garcia, and told Garcia he would kill Guerrero in the latter instance. Defendant's phone threats against Eggman were mild in comparison to these incidents. (See, e.g., *People v. Kipp* (1998) 18 Cal.4th 349, 372 [risk of prejudice "was not unusually grave" where the disputed evidence was not "significantly more inflammatory than the [charged] crimes"].) Finally, any error in admission of the calls was harmless under both state and federal constitutional standards, given the overwhelming evidence of defendant's guilt.

Defendant also made several calls to Villalon. In the first call he told her, "I don't want you to [*sic*] being with no guys." Villalon responded, "Oh my God, why do you do that to me? You do that every fucking conversation that we have, you know how much that fucking bothers me." Defendant responded, "I wouldn't want another guy to take you from me." Villalon replied, "I know but you need to stop, it gets on my nerves, I'm already sad enough, for you to do that to me every fucking phone call."

In another call to Villalon, defendant said, "I don't want no fools over there trying to help you out just cuz." Villalon told him to "shut up," and started crying. Defendant capitulated, but added, "I know no matter what nobody's going to take you away from me."

Villalon also wrote defendant a letter while he was in jail. In it she wrote, "My mom is not going to let you hurt me. If she knew what's actually happened, she would have killed you a long time ago . . . . But you always try to make me seem like the bad

16

person, like the cheater, the liar . . . .You take it to the point where you take away my things, like I'm some little girl." The letter stated that defendant had taken her phone, her food coupons, her glasses, "[a]nd my dog. Dude, you take the one thing you know means everything to me, and you do it to make me suffer."

Defense counsel objected to admission of the calls to Villalon on the basis that they were prejudicial and cumulative, and admitted for the purpose of maligning defendant's character. The trial court allowed the evidence because "the nature of the defendant's relationship with his girlfriends [was] kind of customary and habitual." The defense did not object to admission of Villalon's letter.

Defendant argues that admission of the calls and letter was an abuse of discretion because the evidence was inadmissible character evidence that was cumulative, and more prejudicial than probative. Defendant preserved his objection to the calls on the ground that they were character evidence. He contends that counsel's lack of objection to the letter should be excused because objection would have been futile. Once again, we disagree that it would have been futile to object. The calls and the letter covered different subjects, and there is no reason to conclude an objection as to one would dictate the outcome of an objection to the other. Nevertheless, we proceed to the merits of the admissibility of Villalon's letter as well, in light of defendant's ineffective assistance of counsel contention.

Defendant's phone calls with Villalon and Villalon's letter to defendant were not inadmissible, as a matter of law, under section 352. Defendant's jealousy of Villalon tends to corroborate Garcia's testimony as to how defendant reacted to her. His conduct toward both women was jealous and manipulative. Given Garcia's mental infirmity, the prosecution was entitled to bolster her credibility with corroborating evidence. Villalon's letter was admissible as to her credibility, in that she purported to support defendant's alibi, while in the letter she vents as to his jealous, manipulative and demeaning behavior.

Finally, as we have held earlier, given the overwhelming evidence of guilt, admission of the phone calls and letter, if error, was harmless.

17

**Closing Argument and Deliberations**

Defendant further contends that the prosecutor's emphasis on all of the challenged evidence in closing arguments exacerbated its prejudicial effect. With respect to defendant's drug use, the prosecutor made one comment: "[Rodriguez] told us that defendant was using meth everyday." He did not emphasize drug use in closing. He mentioned it briefly. The prosecutor did argue that defendant had guns, but this fact was already before the jury through properly admitted evidence. The prosecutor emphasized defendant's jealousy directed at Garcia for a permissible use—motive. Defense counsel argued that the evidence of jealousy was being used to smear defendant's character. Rather than relying on character evidence, the prosecutor in closing argument responded: "Ladies and gentlemen, the defendant isn't charged with murder because of his temper. He's not charged with murder because of his jealousy. He's charged with murder because he shot and killed Robert Guerrero. [¶] Now, this is not win-at-all-costs. I'm talking about somebody's life here. This is about justice. Justice for Robert, and also for the defendant, if he truly did not commit the murder. This is not a win-at-all-cost." He went on to catalog the extensive properly admitted evidence in support of defendant's conviction. In light of the abundance of admissible evidence against defendant, which the jury was reminded of in great detail just before deliberations, the prosecution's closing argument reference to defendant's drug use was unlikely to have impacted the jury's verdict.

Defendant also argues that the length of deliberations and the fact that the jury requested readback of Contreras's and Dominguez's testimony and review of the surveillance video, establishes that defendant's case was close and that he was prejudiced by the improper admission of evidence. He asserts that the seven hours of jury deliberation was excessive in comparison to the three-and-a-half days of trial. In the real world, juries sometimes return a verdict quickly in close cases, and other times engage in extended deliberations in cases with overwhelming guilt. The length of deliberation has never been shown to have a direct correlation to the strength or weakness of the

18

prosecution's case. The only thing reflected by the length of deliberations here is that the jury took its time to reach a verdict in a case with significant ramifications. Consistent with making a careful decision, "we assume that the jury spent time going over their instructions to make sure that they were properly carrying out their duties." (*People v. Walker* (1995) 31 Cal.App.4th 432, 438.) "[W]e find that the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*Id*. at p. 439.) The jury approached its task with care, requesting a rereading of certain testimony and an examination of the video from the market. None of this suggests the case was anything other than what it appears to be—a prosecution supported by overwhelming evidence of guilt.

**Cumulative error**

Defendant contends the cumulative prejudicial effect of the various trial errors he has raised on appeal requires the reversal of his conviction. The few errors we have identified are clearly harmless in the face of the overwhelming evidence of defendant's guilt. Defendant's trial was not fundamentally unfair. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1056.)

# DISPOSITION

The judgment is affirmed.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

GOODMAN, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.